## Gulf, Colorado & Santa Fe Railway Co. v. B. J. Brown.

### Decided April 14, 1897.

**1. Negligence—Railways.**

See evidence held to sustain finding of negligence on the part of a railway company in failing to flag far enough back to enable a freight, following a passenger train which had stopped, to avoid a collision.

**2. Same—Pleading—General Averments.**

A general allegation of negligence on the part of defendant's servants operating its trains, following specific allegations of negligence of those of the foremost train in failing to properly flag the following one, held sufficient to put in issue and admit evidence of any negligence of such employes, where no special exceptions were filed.

**3. Attorney—Argument.**

Where the evidence showed that the engineer's signal for brakes was not responded to, and no explanation of the failure was given, it was not improper for the plaintiff's counsel to comment upon a supposed absence of the necessary number of brakemen on the train.

**4. Same.**

Where a flagman went back the usual distance to signal a following train to stop, but in view of the grade, weather, etc., the distance proved insufficient, counsel for plaintiff were properly permitted to urge the failure to go further back to flag, as showing negligence.

**5. Same.**

Counsel may properly argue any hypothesis supported by evidence though there is evidence to the contrary.

**6. Same—Exceptions.**

Where counsel, after several exceptions taken to the argument of the opposing counsel, declined to interrupt him further, but gave notice that he would except to all improper arguments, a bill of exceptions taken to the remarks of counsel treating as an admission of liability the fact that defendant had settled with others injured in the same accident with plaintiff, which did not show that the objection was called to the court's attention at the time, nor show wherein the argument was improper, did not present ground for reversal.

**7. Passenger Carriers—Degree of Care.**

A charge requiring of a carrier of passengers "such a high degree of care, etc., as would be used by cautious, prudent, and competent persons under the same or similar circumstances," and that such carrier, though not an insurer, should "use the utmost care" in providing for the safety of the passengers, was correct.

**8. Damages—Personal Injury.**

See opinion for evidence upon which a judgment for $12,500, for personal injuries received in a railway collision, was sustained.

**9. Same—Charge.**

See charge enumerating the elements of damages recoverable for injuries to the person, held not objectionable on the ground of authorizing a double recovery.

**10. Same—Augmenting Previous Illness.**

See charge allowing damages in case plaintiff's injuries augmented his sufferings from previous complaints, held correct, there being evidence to show such previous complaints, though plaintiff claimed otherwise.

**11. Evidence—Self-serving Declarations.**

Testimony as to the effect of personal injuries to a physician upon his ability to practice his profession, based on the witness' observation of his conduct since the injury, was admissible, its weight being for the jury.

**12. Evidence—Physician's Earnings—Estimate By Witness.**

A witness who had derived his knowledge of the value of a physician's practice in part from his books stated that from his knowledge of his business, independent of

information derived from the books, he could estimate it, and from such knowledge placed it at $4000 to $5000 per year, the estimate based on examination of the books being larger. *Held,* that an objection to the testimony on the ground that the information was derived from the books, which were not produced, was properly overruled.

**13. Same.**

Evidence as to the amount of a physician's practice, by a neighbor, that it seemed "like he had all he could do," was not inadmissible on the ground that it was uncertain and indefinite.

**14. Medical Expert—Simulation of Symptoms.**

The exclusion of testimony of a medical expert as to the possibility of feigning symptoms in general of the character exhibited by a plaintiff claiming personal injury, is not ground for reversal where the witness was permitted to testify that, having examined the plaintiff, he believed his symptoms to be feigned, and as to the possibility of simulating the various symptoms exhibited by him.

**15. Exceptions to Evidence.**

A bill of exceptions to evidence admitted should contain the evidence objected to, and not refer therefor to the testimony of the witness, as preserved in the statement of facts.

**16. Medical Expert—Statements of Patient.**

A medical expert testifying as to the condition of one treated or examined by him may, it seems, testify to the statements of such person as to sufferings or symptoms, past as well as present.

**17. Same.**

The admission of such testimony, as explanatory of the ground of the expert's opinions, would, it seems, be harmless, if erroneous, where the patient had upon the trial testified to the same facts so detailed to the physician.

**18. Continuance—Amendment—Surprise.**

The filing of an amended petition, alleging impotency and diabetes as results of the personal injury originally declared on, can not entitle defendant to a continuance on the ground of surprise where these results were testified to in depositions on file for four months preceding.

**19. New Trial—Newly Discovered Evidence—Cumulative.**

A judgment will not be reversed for failure to grant a new trial on the ground of newly discovered evidence which is merely cumulative.

APPEAL from McLennan. Tried below before Hon. SAM. R. SCOTT.

*Baker & Campbell, J. W. Terry,* and *Chas. K. Lee,* for appell .

*Herring & Kelley* and *Clark & Bolinger,* for appellee.

COLLARD, ASSOCIATE JUSTICE.—This is a suit brought by appellee against appellant for personal injuries resulting from a collision of two of appellant's trains near Bellville.

The facts are: Plaintiff was a passenger on defendant's passenger train, in the rear coach. The passenger train broke down in the night near Bellville and stopped on the main track about an hour or more. While so standing near the foot of a long grade, a freight train following down the long grade ran into the rear of the passenger train, causing the injuries to plaintiff for which the suit is brought. It was a dark night, and raining. The freight train consisted of seventeen cars—a mixed train, loaded with stone and other freight. The track was slippery. This train was hard to control on account of the grade and the slippery condi-

tion of the track.  The engineer of the freight passed a flagman sent out from the passenger train about half a mile from the latter.  The flagman had white and red lights, which were seen by the engineer about two hundred yards before coming up to him, when he made an effort to stop the train.  He called for brakes at once, but the testimony does not show that there was any response to the call or that the brakes were used to assist in stopping the train.  He reversed his engine and sanded the track, using all the sand he had in his effort to stop, but could not do so, and the collision occurred.  He was running about twenty miles an hour on the grade and, he says, about four miles an hour at the time of the collision.  It would have taken two miles or more for the engineer to stop the train.  He could not have stopped it by himself under three miles on that heavy grade.  With assistance to help hold the train he could have stopped in the length of his train.  The passenger train had passed the freight train at Brenham, and the conductor of the passenger train knew the freight was following him.

The jury might well have found, on the testimony of Baird, the conductor of the passenger train, that the flagman was not sent back until eighteen or twenty minutes before the collision occurred.  The stop had been an hour, and this would make it appear that the flagman was not started back until forty minutes after the passenger train had stopped.  The conductor, however, also says that he sent out a flag immediately after the passenger train stopped.  This could not be true, if the other statement be true—that the flagman had been sent out only eighteen or twenty minutes before the collision.  The flagman sent back had only gone about half a mile when the freight met him.  If he had been out an hour he could have gone much farther back; and, considering the heavy grade and other conditions, it was his duty to go back far enough, if he had time, to secure the safety of the passenger train.  It seems if he had been out an hour he had time to flag back much farther than he did.  If the conductor sent him out immediately, as he says, the brakeman was negligent.  If the conductor waited forty minutes after the passenger train stopped, to send him back, then this delay was negligent.  The negligence, then, must be imputed to one or the other, or to both, and both were employes of defendant company.  The fact that the flagman went back as far as usual, as shown by the testimony for defendant, would not exempt the company from the charge of negligence, even if it had such a rule.  The conditions should govern in determining how far the flagman should go—the steep grade, the dark night, the rain, the slippery track, the curve in the track two hundred and fifty yards to the rear of the passenger train—in short, all the conditions which interposed to prevent the stopping of the freight in the half mile.  The most culpable negligence was the failure to protect the passenger train from collision, and is attributable to the operatives of the passenger train.

We must conclude that there was negligence on the part of defendant's servants operating the two trains, which caused the collision and the injury to plaintiff.

The evidence is conflicting as to whether or not there were tail lights on the rear of the passenger train, to warn an approaching train. The engineer says, however, that he saw the lights on the rear coach when he turned the curve two hundred and fifty yards back of the passenger train. He could not have seen them farther back, because of the curve, and he could not stop in time to prevent the collision. He had been attempting to stop from the time he saw the flagman's lights, half a mile back. Whether there were lights on the rear end of the passenger train, or not, was immaterial. The collision would have occurred with or without the signal lights so placed.

Just before the collision the conductor of the passenger train came through the coach where plaintiff was. The conductor was going back, and told the passengers to "Be quiet, and don't get excited"—or words to that effect. His object was to prevent a stampede of the passengers. He stood on the steps keeping the people back, keeping them from stampeding, because the steps were easily broken, and he was satisfied the collision would not break the car, and if the passengers got out on the steps they might be hurt. The collision broke in the door of the rear passenger car, and broke it up considerably. Plaintiff was sitting in the front part of the rear coach of the passenger train. The train had been stopped about an hour, and when the conductor came through hurriedly telling the passengers to keep quiet, the plaintiff did not move, but was sitting on the seat as stated when the crash came. He had partially raised to his feet, noticing some men jump off. He fell forward, striking the back of the seat in front of him and breaking its leg, and fell over on his head in the aisle. He had one rib broken and a considerable contusion on the top of his head. He went to the back end of the car, where he had heard a man was hurt by a cut on the face, and closed up the wound. He was on his way to the Confederate reunion at Houston. He did not know how badly hurt he was at the time, but his side and head began to give him trouble. His head had not quit hurting up to the time he testified. He had fallen on his head at the time of the accident. After his arrival at Houston he commenced coughing, and coughed incessantly. He told his companions he would have to go home. He went back to the depot and went home on the next train, and was suffering severely when he got back. He was sixty years old, and weighed when he started two hundred and fifty-two pounds, and became much reduced afterwards; could not sleep at night for two or three months; did not sleep on an average of two or three out of twenty-four hours; had horrid dreams; for a time he could not sleep in bed at all; would fall off; quit sleeping on a bed and slept on the floor; he never was affected that way before. The day after the plaintiff got back he had to decline to dine with his two brothers; his family went and left him at home; he got up and fell back two or three times before he got steady enough to get to the wash-bowl; washed his face and hands and fell down on the gallery. It was vertigo. He had never been affected that way before; his health was good when he started to Houston. After plaintiff got back from Houston he sent for Dr. Compton. Dr. Compton

and Dr. Nail dressed his side. There has not been a day, and probably not an hour, that he has not had headache when awake since the accident.

Up to the time of the hurt on the cars plaintiff's health had been good from the time he was treated for catarrh by Dr. Ferrell. He had something like la grippe, or a bad cold, and had a bad recovery from it, and an abscess formed in the antrum, and when he would lie down or sit down he would have some swimming in the head, but never when he was walking about. Dr. Ferrell cured him. That was a little over a year before the trip to Houston, and he was completely recovered from all the swimming in the head and dizziness. His nervous system is injured. He was a physician, but could not afterwards, after the collision, study his own case. He can not read a page in a book; the letters get confused. He tried to read several times and had to quit. He consulted many physicians, including one Dr. Gray in New York. He was threatened with paralysis; threatening was marked; could not use his right foot nor his arm well. After Dr. Gray of New York (who is a specialist on nervous diseases) commenced treating him he got some relief, but the headache never stopped. When he got to New York he could hardly remember anything; he forgot his hotel in St. Louis, and had trouble to find it. When he had la grippe he did not stop his practice. He had a spell of pneumonia when young. He had not been in bed a day since from sickness before the injury on the cars. The testimony shows that the base of the brain had been injured—a deposit there from which plaintiff perhaps would not recover. The cerebellum was injured, affecting his vision, causing vertigo, failure of memory and locomotion, all resulting from the injury on the train. The trouble was progressive at the time of the trial. Plaintiff had lost forty or fifty pounds in flesh up to a month before the trial, since when he had gained four or five pounds, "eats and sleeps a litttle better" (at time of trial), but his muscles were gone—soft as a baby's. He walks with difficulty (at time of trial), and at times could converse with a man for a while, but at other times it was with difficulty he could understand the person or make him understand. He has been totally impotent, having no sexual desire, since the accident, which was not the case before the accident, and has diabetes, which he did not have before. All these affections resulted from the injuries received in the collision of the trains. After plaintiff returned from New York one Saturday afternoon he laid down and had heart failure; had intermittent pulse, which would beat once when it ought to beat three times. He recognized that a man could not live long in that condition. He was bathed in cold perspiration, and lay in that condition some two or three hours; laid down again, and it came on again. He got up and went to Dr. Nail's, who worked with him until two or three o'clock, and then sent for Dr. Armstrong, and it was about four o'clock before they got up a reasonable circulation. When plaintiff got home from Houston he would examine his pulse, and it would be about 100; afterwards he would have sweats, and the pulse would be about 130, and sometimes as

high as 140. At the time of the trial he was subject to attacks of heart failure, though they were not as violent as through December and January before, but more so than on the 1st of March previous. He walked unsteadily, and when blindfolded and standing with his feet close together he would sway or stagger. This was the result of the trouble at the base of the brain. He was disabled from doing mental work, and had to quit practicing medicine. He would visit a patient whom he had seen the day before and find that he had forgotten his treatment. Before his hurt he had a good practice in the town where he lived; rode a great deal each day and night, and his practice amounted to from $3000 to $5000 per annum. His physical and mental condition and his sufferings were the results of his injury on the cars; at least, if he suffered before in such manner—and there is some testimony that he did—such sufferings were greatly aggravated, and he was brought to his present condition by the injuries received on the cars. His injuries are permanent.

There was some testimony that before plaintiff's hurt on the cars he had symptoms similar to those which he says came on him after his hurt on the cars, but the evidence tends to show that he had recovered from such attacks before the collision.

*Opinion.*—Appellant assigns as error the refusal of the court to grant the motion for a new trial upon the fourth ground of the first amended motion, which is that "the court erred in practically submitting to the jury any and every possible theory of negligence that there might have been any evidence to support, and in effect charging the jury that they might find against the defendant if it was negligent in any respect whatever; the only allegation of negligence in the petition being that defendant failed to give proper signals and warnings, and the court should have confined the jury to that issue of negligence."

It is also insisted that the court erred in refusing to instruct the jury, at the request of defendant, to the effect that "plaintiff only alleges negligence on the part of defendant in failing to give proper signals and warning to the approaching train in time to prevent the collision; and under such allegation he is not entitled to show or recover on any claim of negligence in any other particular; and therefore if the jury should believe from the evidence that the defendant and its agents and servants in giving signals and warnings to the approaching freight train exercised such a high degree of care and foresight as to possible dangers and such a high degree of prudence in guarding against them as would be used by very cautious, prudent, and competent persons under similar circumstances, the jury would find for defendant."

The same question is raised in another assignment, that the verdict is contrary to the law, because the only averment of negligence is as stated, and that the evidence showed that all usual signals and proper warnings were given.

The petition shows that plaintiff was a passenger on defendant's pas-

senger train en route from Crawford to Houston, Texas; that when it reached a point not far from Bellville and Sealy it stopped one or two hours on the main track because of the disabled condition of the engine; that while plaintiff was sitting in the rear coach of the train the rear of the train was run into by a freight train of defendant, going at a high rate of speed in the same direction and over the same track as the passenger train, causing a very violent collision, etc. The petition then describes plaintiff's injuries and sufferings, and then proceeds to state that the collision occurred at 3 o'clock a. m.; that if the passenger train had been properly cared for and guarded while it was stopped the collision would not have occurred; that the stopping of the train upon the main line, in the night time, away from any switch, side-track, or station, created a necessity for the exercise of great care and caution to prevent collisions; but that notwithstanding the necessity of such care to protect persons, defendant's servants carelessly permitted the train to be run into as stated, and they failed to give proper signals to the freight train in time to prevent the collision. And it is further alleged "that defendant's servants in charge of the freight train knew of the presence of the train on which plaintiff was riding in time to check it so as to prevent said collision, but that they failed to do so. Wherefore, plaintiff further alleges that defendant's servants and employes were guilty of negligence without which said collision would not have occurred."

The last part of the petition quoted is a general averment of negligence of defendant's employes operating its trains. It is general as to the negligence of persons operating the freight train failing to so operate it as to prevent the collision after they knew the passenger train was in front of them. We think, too, that the last expression—"Wherefore, plaintiff further alleges that defendant's servants and employes were guilty of negligence," etc.—refers to the whole case as stated, and includes the negligence of the employes operating the passenger and freight trains.

If defendant was not satisfied with the general averment it should have specially excepted to its want of particularity. The averment was sufficient to admit all the testimony offered on the subject of negligence, and would warrant the charge upon such testimony and the refusal of the charge asked.

It also warranted the charge given by the court, as follows: "Now, if you believe from a preponderance of the testimony that the plaintiff was, on or about the date alleged by him, a passenger on the railway of defendant, and that he was, on or about the time alleged, injured while a passenger in the care of defendant, by the means and in the manner as alleged in plaintiff's petition, and if you further believe from the testimony that plaintiff's said injuries, if any, were directly caused by negligence on the part of defendant, as the same has been defined and explained herein (and without fault on his part), then you are instructed that he is entitled to recover."

In the case of Railway v. Smith, 74 Texas, 278, there was no allegation that it was not in plaintiff's power to specify particular negligence. The court approved the following as correct principles: "When the breaking down or overturning of a coach is proved, negligence on the part of the owner is (may be) implied; he has always the means to rebut this presumption if it be unfounded." "The fact that the car runs off is evidence of defect or negligence somewhere, and when the track and the cars are under the exclusive control of the defendants it has been held evidence of negligence sufficient to charge them, in the absence of any explanation showing that the accident happened without fault on their part. It is not incumbent on the plaintiff, after proving an accident which implies negligence, to go further and show what the particular negligence was when from the circumstances it is not in his power to do so." So the court decided that evidence that the derailment resulted from the spreading of the track was admissible to prove negligence under a general allegation of negligence. "The pleadings are not required to be broader or more specific than the evidence."

In the case before us the petition stated the facts—the passenger train in front carrying passengers, the freight train following, the collision at night—and this was followed by a general allegation of negligence on the part of defendant's employes, resulting in the collision. This was sufficient to warrant the charge of the court that if the collision and injury were caused by the negligence of defendant's servants defendant would be liable. Receivers v. Withers, 1 Texas Civ. App., 544; Lumber Co. v. Denham, 88 Texas, 203; Railway v. Wilson, 79 Texas, 371; Railway v. Adams, 6 Texas Civ. App., 107-108; Railway v. Parsley, Id., 155, and authorities cited.

It is hardly necessary to say that there was no error in refusing defendant's special requested charge instructing the jury peremptorily to find for the defendant.

There was no error in overruling the motion for a new trial upon the alleged ground of improper argument to the jury by Attorney D. C. Bolinger on behalf of plaintiff in opening the case. That defendant had not the necessary number of brakemen on the freight train was a legitimate subject of comment, from the fact that there was no proof of any use of the brakes after the engineer called for brakes; also the failure of defendant to call witnesses—brakemen on the freight train—if there were any, to explain their conduct after the call for brakes. The attorney's assertions that the defendant was negligent in stopping its train in the place it did and in failing to promptly stop the freight train were legitimate matters of discussion in argument to the jury, as well as the general features of the case showing negligence.

Nor was it improper to refer to the flagman as going up the grade and stopping, under the circumstances. It appears that he only went back about a half-mile, when the evidence shows that he had time to go back a much greater distance—a mile or more—and that under the circumstances—the rain, the dark night, the slippery track, the steep grade,

and the situation of the passenger train on the main track—it was his duty to meet the coming train much farther back. It is no answer to this to say that he went back the usual distance. The circumstances should have dictated his duty. If the company only required him to do as he did, it would be at fault and inexcusable. These were matters for the consideration of the jury and for discussion before them. They arose naturally from the facts in proof.

The argument of Captain Herring on this point was not out of the record. There was testimony from which the jury may have come to the conclusion he insisted on—that if the flagman had gone back as far as he ought to have done there would have been no collision and nobody hurt. It was in proof by several witnesses that the passenger train had been stopped an hour or more when the collision occurred. The conductor testified that "the flagman had been out eighteen or twenty minutes before the collision occurred." Captain Herring stated in argument that the passenger train had been stopped an hour before any warning had been sent out. He was interrupted by counsel for defendant, who wished to correct him. Captain Herring modified his statement, declaring that the conductor swore that he sent out the flagman within eighteen or twenty minutes before the collision. Counsel for defendant insisted that the conductor said the collision occurred in eighteen or twenty minutes after they stopped. The conductor also testified that he sent out the flagman immediately after the stop. Another employe also testified that the flagman went out as soon as the passenger train stopped. Captain Herring's argument on the point was legitimate. As he stated, it was a question for the jury. It was his privilege to argue the facts, and because there was another conclusion deducible from them he was not bound by it.

All the argument made the subject of assignment of error, and to which any special objection made in the court below could be applied, has been discussed in the foregoing. Counsel for defendant declined to make further special objections to argument, but claimed that it was the right of the company to have the court control the argument and confine it within proper bounds. Defendant's counsel, after making an objection, which we have discussed, stated: "I do not care to interrupt counsel in the course of their speech. I do not understand it is necessary for me to do so, but I except to any improper argument and call on your honor to restrain counsel within proper bounds." The court replied: "If there is any particular point during the course of their argument when they are going outside of their bounds, if you will let me know, we can consider the matter and then stop him or permit him to proceed. I do not understand that counsel can just sit down and except to counsel's argument to a whole thing before he makes his speech." Counsel for defendant then excepted, as follows: "We except to any improper argument that may be made in the course of the speech." The court said: "I will state now that in the event counsel argues upon any matter that counsel does not think proper, if you will call the court's attention to it during

the progress of the argument I will, if I think he is outside the bounds, stop him; if I think he is not, I will permit him to proceed, and you can have your bill. I understand that to be the practice." Defendant's counsel replied: "I do not so understand it, and wish permission to state that I will not take exceptions in that way, unless the argument becomes so flagrant as to make it absolutely necessary to do it, for the reason that I would probably be constantly interrupting counsel, and would probably prejudice the defendant's cause with the jury." The court then said: "I want the record to show the view I take of it and the opportunity the court gives you to take the exception. I will give you a bill to the remarks the counsel is now making upon that particular point, if you desire, because I think that it is proper argument and within the bounds." Thereafter Captain Herring, in addition to his argument before referred to and ruled upon, commented upon the fact that defendant had settled with other persons who were injured in the same disaster, as an admission of negligence by defendant in operating the trains. The testimony showed such settlements. Appellant's brief does not point out what objection could be properly raised to the remarks of counsel, nor does its bill of exception. It is not our province to make the objection and show that there was error in the ruling. We do not understand that the court required counsel to make objections in such way as to interrupt the argument that was being made. He required that the objection be made, that his attention be called to the improper language. It has been held that the court should stop improper argument without objection and upon his own motion. Willis v. McNeill, 57 Texas, 465; Willis & Bro. v. Lowry, 66 Texas, 542. This rule has been materially modified in later cases than those cited. Moore v. Rogers, 84 Texas, 2; Moore v. Moore, 73 Texas, 394; Railway v. Greenlee, 70 Texas, 562.

The courts of this State now lay much stress upon the failure to call the court's attention to the language used in argument at the time it was used. It is not shown in the present case that the court heard the remarks of counsel now under consideration, so as to show that he neglected a duty—if it were a duty—without objection, to stop improper language in discussion of a case. As before stated, there was evidence to the effect that defendant had settled with other persons injured in the same collision. We can not say that there was error in the court's failure to prevent the argument on the point.

There was no error in the court's charge that "it is the duty of railroad companies to use such a high degree of care and foresight in protecting its passengers from possible damages, and to exercise such a high degree of prudence in guarding against them as would be used by cautious, prudent, and competent persons under the same or similar circumstances; and while railroad companies are not to be regarded as insurers of the safety of their passengers, still they are required to use the utmost care to provide for their safety, and a failure to use such care and prudence as above defined is negligence."

The rule as laid down in Railway v. Halloren, 53 Texas, 53, was again

reiterated and approved in Railway v. Welch, 86 Texas, 203. In Railway v. Halloren the rule is stated: "Railroad companies, however, are not insurers of the safety of their passengers further than could be required by the exercise of such a high degree of foresight as to possible dangers, and such a high degree of prudence in guarding against them, as would be used by very cautious, prudent, and competent persons under similar circumstances."

The court's charge in this case did not require such high degree of care as *very* cautious, prudent, and competent persons would use under similar circumstances, but only such as would be used by cautious, prudent, and competent persons.

Appellant contends that "utmost care" was not required of the company to protect its passengers. Our Supreme Court has approved the expression "utmost care" in a charge in regard to the duties of railroad companies to their passengers. Gallagher v. Bowie, 66 Texas, 266; Railway v. Welch, 86 Texas, 205.

In the last case cited Justice Brown condemned a charge requiring the greatest possible care in such cases; but he distinguished such care from utmost care. "Utmost care," he says, "means the greatest care, and falls short of the expression used in the charge ('the greatest possible care'), in this, that it (the utmost care) is understood to apply to the surroundings as matters then stood and could be foreseen; but all possible care has a broader and more unlimited meaning. The word possible, as used in this connection, means 'capable of being done.' " Levy v. Campbell, 19 S. W. Rep., 438.

See also Dillingham v. Wood, 27 Southwestern Reporter, 1074, holding that "utmost care" is required, citing the two foregoing cases of Gallagher v. Bowie and Railway v. Welch, supra. The rule stated may be said to be established law in this State.

We can not say, in view of the facts, that the verdict was excessive. The fact that plaintiff's injuries were the cause of only an aggravation of old troubles might be of weight in assessing the amount of damages; but the proof is sufficient—his injuries, his suffering, his loss of faculties, his necessary abandonment of the practice of medicine, in which he had received from $3000 to $5000 per annum, and other considerations recited in the statement of facts, in our opinion fully warrant the verdict.

The charge of the court can not be fairly construed to allow a double recovery for the same items of damage, and the jury could not have so understood it.

The charge instructed the jury that in case they should find for plaintiff, "he would be entitled to recover such damages, if any, as he may have sustained as the direct and proximate results of defendant's negligence, if any. And in determining the amount of your verdict for damages, you will take into consideration the nature and extent of the injuries to plaintiff so received, and the physical and mental pain resulting therefrom, if any, and you will also consider any loss of time or diminished capacity to earn money at his chosen profession, if any, which he

may have sustained as the direct and proximate result of said injuries; and you will assess such damages for plaintiff as will, based upon the evidence, be a just, fair, and reasonable compensation for said injuries and pecuniary loss and damages he has sustained, if any, and you will also include in your verdict such further sum or sums of money, if any, as you may find he has necessarily incurred in the proper care and treatment of his injuries so caused by defendant, if any—your verdict in no event to exceed the amount claimed in plaintiff's petition."

It was not improper for the court to inform the jury what items of damages they might consider, and this would not be allowing a double recovery after telling them in general terms to find damages for injuries caused. The pecuniary loss by expenses in having his injuries treated was not covered by other parts of the charge, especially not in itemizing the pecuniary loss resulting from the abandonment of his profession. It was right to call the attention of the jury to the items alleged and proved for which compensation would be allowed, and it was right to tell them they should consider such items and include them in their estimate of damages.

It was proper to instruct the jury that if they should find that plaintiff, prior to his injuries, was suffering with any diseases or complaints, and should also find from the testimony that such diseases or complaints had been aggravated by the negligence of the defendant, as before explained, then plaintiff would only be entitled to recover for such increased or augmented sufferings as were caused and produced alone as the direct and proximate result and consequence of the negligent acts of defendant, if any, as charged.

In so instructing the jury the court very properly guarded the rights of the defendant, so that it would not be held responsible for sufferings and injuries not inflicted by defendant. Plaintiff's position, it is true, was that he was a sound man, and sought to hold defendant responsible for all his injuries and their results; but there was testimony from which it might have been inferred that some of his sufferings might have been the result of prior troubles or sickness, and that they were augmented by the injuries received at the hands of the defendant company. The charge was proper. Railway v. Shafer, 54 Texas, 641.

Defendant reserved a bill of exceptions to the admission by the court of the testimony of witness U. Tadlock, as to the amount of practice that Dr. Brown, the plaintiff, had done since the alleged injury, how he had been able to get about, how much he had stayed at home, and what his conduct had generally been in getting about and doing practice since the injury. The objection to the testimony was that such conduct was in the nature of self-serving declarations; that it could be easily manufactured, and should be excluded for the reason that self-serving declarations were excluded. The witness testified: "I do not think plaintiff has undertaken to practice any since the accident."

The testimony was admissible. It was for the jury to determine its proper weight, whether plaintiff was or not feigning.

The plaintiff testified that he had tried to practice since his hurts, but was physically and mentally unable to do so and had to quit. His conduct and habits of the kind mentioned in the bill at the time he said he was suffering from his injuries were a proper subject for the consideration of the jury as a part of the res gestae, as his verbal declarations explanatory thereof would have been.

The bill of exceptions was agreed to cover all other such testimony.

It is insisted by appellant that the court erred in permitting the plaintiff to prove by witness U. Tadlock his estimate of Dr. Brown's annual income from the practice of medicine. The bill of exceptions shows that after the witness had testified on behalf of the plaintiff that Dr. Brown was a practicing physician, had done a large business, and that he (witness) had his books for the year 1894, he was asked by plaintiff's counsel, "Can you give the court an idea as to the amount of his practice?" Defendant objected, on the ground that it was evident that the witness's estimate was based to a large extent upon information derived from the plaintiff's books, and the testimony was hearsay, and the books were the best evidence. Before the court could rule, the witness answered, "Yes, sir." Whereupon the court stated, "I think if he can state outside of and independently of the books, if he can give anything like a correct estimate of what it is, he can do it." Plaintiff's attorney then asked the witness, "You may state to the best of your information." The witness asked, "To the best of my recollection?" The court: "The question is this: Do you know outside from what the books show?" Answer: "No; I don't know positively." The court: "He don't ask you positively; but he asks if you can undertake to state anything like the accurate amount." Answer: "I will state, I was very surprised myself to see the magnitude of his business." Question by defendant's counsel: "Is not your knowledge of his practice based upon his books?" Answer: "Not altogether; no." Question by defendant's counsel: "Did you not say you expressed surprise to see that he did such a large practice from his books?" Answer: "I knew he was doing a large business, but I did not know that he was booking as much as he did." The court: "Can you undertake to state to the jury anything like a definite idea of the amount of business he did independently of the books—the same as if you had never seen them?" Answer: "Yes, sir; something like $5000 a year." Defendant renewed its objection, and moved to exclude the testimony; the objection was overruled, and defendant reserved an exception, and then the witness testified: "I was out with plaintiff quite a lot myself, and I know that he was going regularly and a great deal at night. I was keeping Charley Standifer's books, and his office was in Charley Standifer's drugstore, and I know from his office work that he was very busy outside his calls. I was not in the office with him, but in the same building in which the office was located. I should say his practice covered ten miles east or west of Crawford. Up and down the Santa Fe there were physicians at Valley Mills and McGregor, but his practice east and west would extend fully ten miles and probably more. To my own knowledge

that practice continued up to the time of plaintiff's injury. The population of Crawford is some 500 or 600, and plaintiff had the bulk of the practice there." On cross-examination he answered: "My knowledge of Dr. Brown's practice was derived partly from posting his books and partly from my own observation. If I had not examined his books I would not have sworn that his practice amounted to any given amount, but I would have approximated it at from $4000 to $5000. I was surprised, because he was doing a bigger practice than I thought he was doing. He was booking from $10 to $35 per day, besides his cash business. I know nothing of his cash business at all. I could not tell how much of that he collected without refreshing my memory by looking at his books, but plaintiff has the reputation of being a good collector." After this defendant renewed its objections regarding the amount of plaintiff's practice, and again asked that it be excluded on the ground that the testimony shows the estimate of the witness to be based upon plaintiff's books, and was hearsay, and that the books were the best evidence. The court overruled the motion, and defendant excepted and now assigns the ruling as error.

A close inspection of the bill of exceptions shows that the witness's estimate of the amount of the annual practice at something like $5000, or from $4000 to $5000, was not based upon the books, but was independent of the books. His estimate of the amount booked besides cash practice was from $3650 to $12,775 per annum, at from $10 to $35 per day. The objections to the testimony, as shown by the bill of exceptions, were not improperly overruled; and if the objection had been to the witness's giving his opinion as to the matter, we believe it would have been admissible. He was sufficiently qualified to state such opinion. But we are only called on to decide whether the objections made were good. We believe they were not.

Another witness for plaintiff, Philip Nolan, was asked by plaintiff's counsel: "What sort of practice did he (Dr. Brown) do from the time you became acquainted with him in 1881 up to last May?" Answer: "He did a fine practice in our country; it seemed to me like he had all he could do." Plaintiff's counsel asked: "All he could do?" Answer: "It seemed like that to me."

Defendant's counsel objected to this line of inquiry, and asked that the testimony be excluded on the ground that it was too indefinite and amounted only to common neighborhood repute as to the extent of the Doctor's practice, and reputation is not admissible. The court remarked: "It is a matter of circumstances for the jury to conclude from as to the extent of his business, if he lived in the neighborhood and saw it frequently," and the court overruled the objection. Defendant excepted, and now insists that the ruling was erroneous. The bill of exceptions was approved as stated above, with an explanation by the court that after both questions had been answered objection was made and overruled, but there was no request or motion to exclude the evidence, and the witness further testified that plaintiff did a general practice all around

the country, fifteen, twenty, and may be twenty-five miles from Crawford, and a good practice in town.

We do not see that the objection to the testimony on account of its being neighborhood reputation arises in the matter at all. It does not. The extent of the plaintiff's practice was a matter for the consideration of the jury, to enlighten and determine them as to the value of his practice per annum as estimated by other witnesses. The testimony was not objectionable on the ground of being vague, indefinite, and uncertain. Plaintiff was not required to prove his whole case by one witness.

Defendant's witness, Dr. A. C. Scott, a physician, being on the stand, and qualified as an expert, defendant's counsel asked him if from his experience as a physician and from his study of the text books he could state whether or not it is a well known fact that symptoms and troubles of the kind testified to by plaintiff and complained of in this case may not be simulated; to which question plaintiff objected. Then defendant stated to the court that it expected to show by the witness that in his hospital experience as a physician he had known many instances where complaints and symptoms similar to those of plaintiff had been successfully simulated and expert physicians deceived thereby, and that such instances were recorded in leading medical authorities; and further, that it desired to show by the witness the circumstances of cases of that kind, where the simulation had been successfully practiced, and to show the same by witness's own experience. The court ruled that all such testimony was inadmissible, and declined to allow the defendant to show the same. Defendant excepted and reserved a bill of exceptions to the ruling, which was approved by the court, with the explanation that the witness did state that he regarded plaintiff's symptoms and complaints as simulated, and that he was practicing a fraud, in the opinion of the witness.

The witness was located in Temple, Texas, and had been in charge of defendant's hospital at that place over three years; was a graduate at Bellville Hospital Medical College; had hospital experience in Western Pennsylvania General Hospital in Pittsburg; had studied under a preceptor at his home in Gainesville, Texas, and was in the hospital two years. His ten years' practice includes two years in the hospital, and he now holds the position of chief surgeon of the hospital department of the Gulf, Colorado & Santa Fe Railway Company, and is chief surgeon of the road itself. He testified: "I know the plaintiff in this case. I met him last summer or fall. He came to Temple for me to make an examination because of some injury he said he had received on the Santa Fe road. I examined him. I don't remember all the details of the examination, but I first took his own statement for what he had received and the way he had suffered and what his previous condition had been. I then made an examination. I could find no objective symptoms of any injury—nothing to indicate injury, aside from his own statement. I examined his pulse, felt of his neck and arm, and I think, too, his temperature with a thermometer. I examined his urine, and my examina-

tion revealed nothing wrong with it. I noticed his gait while he was in my office and afterwards on the street, and I noticed nothing wrong with his gait. I have seen him one or two times since, but I never noticed anything until yesterday that would lead me to think that he had anything wrong with his muscular system or nervous system. Either yesterday evening or this morning I noticed he walked like he was 'stove up' in some way; it is not hardly the gait that we usually observe in inco-ordination, but his walk seemed to be not altogether a natural walk. The symptoms of restlessness, inability to sleep, irregularity of the pulse, and inco-ordination of the muscles may be accounted for in several ways—by a disease of the brain, or any acute disease, like typhoid fever, or some malarial fevers, or la grippe or rheumatism. Rheumatism is apt to affect the joints or limbs where it is located most quickly, and then secondarily the heart is commonly affected. The heart trouble that follows rheumatism, as a rule, is indicated by some inflammation of the lining of the heart, and it may become inflamed and result in a disease of the valves of the heart." He explained a process of rheumatism affecting the heart and passing out and making a clot in the brain, developing other symptoms. "I examined Dr. Brown with reference to emaciation. I expected to find a very much emaciated man, because I had gotten a partial history of the case before he came down, and I was surprised to find he was so robust looking. The symptoms appearing in Dr. Brown occur with more frequency in men above the age of fifty-five than in younger men, although I can not state the exact percentage. They are more common in cases of fleshy men. Very few men have any sexual desire after they are sixty. * * * The duties of a physician are very laborious and taxing. Forty years of active country practice would have a tendency to wear upon a man's mind and mental and physical energy. It is possible for some of the symptoms described to be simulated; nearly all of them may be simulated. A man may make a verbal statement that he is suffering from pain or from dizziness, that he has weak spells and has headache, and is unable to undergo exertion. The test of not being able to stand with feet together and eyes shut without staggering may be very easily simulated. A man can control the beat of his pulse to some extent—make it faster or slower." Here the question was asked which was objected to by plaintiff and excluded by the court, with the proposed answer.

The witness did not test plaintiff by blindfolding and standing him with his heels together, but says he tested him as to co-ordination by observation, looking at him; says: "When a man has not the power of co-ordination it means that he is unable to walk without picking up his feet carefully and placing them on the ground carefully." He further explains co-ordination and inco-ordination, and says lack of co-ordination may indicate a disease of the brain, or it may indicate the taking of some medicine, as whisky, or it may indicate disease of the spinal cord. The witness explains what the cerebellum is, that it is divided into two parts; one side gives off nerve force to one side of the body and the other

to the other. Lack of co-ordination might be a symptom that one side or the other of the cerebellum was impaired, but not necessarily so. He has tried the test with a battery, but one can not tell with any degree of certainty by it whether there is a lack of co-ordination. A patient can resist the action of a battery, but not always the full current; some can resist a powerful current. The application of a battery would be evidence of inco-ordination. The witness does not believe neuro-retinitis could be simulated. If it were visible there could be no mistake; it would be an indication of some disease of the brain or optic nerve.

Other physicians testified to the presence of neuro-retinitis in plaintiff. They tested plaintiff with the battery and ascertained in him inco-ordination, heart trouble, and imperfect cerebellum, and symptoms of mental aberration.

The witness Scott proceeded to testify: "You can not tell with any degree of certainty by the use of a Faradic battery" (the battery used by other physicians, who by that means confirmed plaintiff's inco-ordination) "whether there is a lack of co-ordination or not. * * * I did not find any organic heart trouble in Dr. Brown. I did not make any thorough examination of his heart; did not examine it with an instrument, and not at all further than examining his pulse. I made an examination of his rib and concluded he probably had a broken rib; I found evidence of that. I told him that, judging from the symptoms he described, I presumed his neck had been sprained. I did not suggest that he should go to New York and be treated by Dr. Gray. * * * When I examined him I found no physical evidence of anything he complained of. I was satisfied there was something mentally wrong with him, but I did not find anything physically wrong. * * * A shock may be received sufficient to produce internal injury to the brain without external injury. * * * Such an ailment of the heart as would produce the symptoms mentioned in plaintiff would be an organic disease. * * * In my judgment plaintiff's gait is simulated. I think he can walk as well as anybody if he wants to. * * * The fact that he weighs fifty pounds less now than he did might or might not indicate some trouble. The pulse may be controlled by placing the mind upon it and holding the breath. I do not say it is completely under a man's control. * * * When I said that I thought that he was mentally wrong I meant that he was depressed. He was depressed by worry and constant concentration of his mind on that one subject. I was not surprised, when I saw plaintiff in the courtroom, that he was emaciated, because I had seen him before and had found him to be just in the same condition that he was in the first time I saw him, as far as I could judge. It was the first time I met him that I was surprised, because at that time I thought that there might be something real in his case."

We find from inspection of the testimony of Dr. Scott that it includes the matter which appellant complains was ruled out by the court. He testified: "It is possible for some of the symptoms described" (speaking of the symptoms complained of by Dr. Brown) "to be simulated; nearly

all of them may be simulated." His testimony also shows which one can not be simulated—that is, neuro-retinitis, a symptom which other physicians found in Dr. Brown's case. Evidently Dr. Scott had answered the question as fully as he could as to plaintiff. So the assignment of error to this point is not well taken. It is: "The court erred in refusing to allow defendant to show by its witness A. C. Scott that persons had frequently simulated injuries like plaintiff complained of, for the reasons and as fully shown by defendant's bill of exceptions number 4." The only part of the bill of exceptions brought in review before us is that particularly specified in the assignment of error. The assignment of error should not be sustained to permit proof of a fact fully covered by the testimony of the witness. Other witnesses testified to the fact.

Dr. Hale, in testifying about inco-ordination of Dr. Brown's locomotion, which he found, said: "It is possible for these movements to be simulated in such a way as to deceive me, but I do not think it was in this case."

Dr. H. W. Brown testified: "A man perfectly sound in all his parts can waver upon the application of such a test" (the test of standing erect with eyes closed and heels together—a test applied by the witness to plaintiff when he found inco-ordination), "but I think it would puzzle him to fool me bad. If anybody could fool me it would be a doctor; he might be better posted and better prepared to deceive me. I had no suspicion aroused in this instance."

This testimony makes plain the fact that persons can malinger the symptoms of plaintiff—a fact which every person knows, and the supposed error of the specific ruling was at least harmless.

The defendant reserved a bill of exceptions as follows: "That on the trial of the case, while the plaintiff's expert witnesses and physicians, Drs. Foscue, Hale, H. W. Brown, J. E. Brown, and others were on the stand testifying in his behalf, plaintiff sought to show by them what they had found to be Dr. Brown's condition when they examined him, and at the outset of the examination of the first of said witnesses—to wit, Dr. Foscue—defendant asked the court to caution the witness that he must only state to the jury what he found by his own examination, that is, objective symptoms, and that he must not detail to the jury what plaintiff told him as to his condition—subjective symptoms—defendant then and there contending that if the plaintiff desired the experts' opinion upon the subjective symptoms the proper way to get the same before the jury was to put to the expert witnesses a hypothetical case showing such subjective symptoms, based upon the record, and let the witness give his opinion thereon; that any statement by Dr. Brown to the physician was hearsay, self-serving declarations, and improper testimony. Whereupon the court ruled that such witnesses were entitled to state what Dr. Brown told them in regard to his condition when consulting with the witnesses in regard to his trouble, and overruled the defendant's objections, and the witnesses were permitted to detail before the jury statements made by the plaintiff to them in their examination of his

pain and suffering, the way he had been affected, and the history of his case generally, as is fully set forth in the testimony of each of such witnesses on examination by the plaintiff's attorneys, as fully shown by the statement of facts, to which reference is here made for the testimony admitted." The court in approving the bill states that these witnesses all treated plaintiff, and were not allowed to state anything he told them outside of his symptoms and condition which were material and proper to enable them to diagnose the case and treat the patient.

Error is assigned in this form: "The court erred in permitting medical experts in the case to testify to the subjective symptoms, the statements of Dr. Brown to them when they made their examination of him, for reasons and as shown by defendant's bill of exceptions number 2."

It is very questionable whether the bill of exceptions is entitled to consideration by this court. A bill of exceptions must point out the specific error in admitting testimony, and it must show distinctly what the evidence was objected to. Houston v. Perry, 5 Texas, 467, 468; Sadler v. Anderson, 17 Texas, 246; Railway v. Leak, 64 Texas, 656.

The bill does not state what the evidence is, but refers the court to the whole testimony of each of the witnesses, leaving it to the court to select from the whole testimony the statements to which the objection might apply. The bill presents a sweeping objection to all statements made by witnesses upon certain subjects, as may be found in the statement of facts. For example, "the way he had been affected." What way? "The history of his case generally." What history, and what was its effect?

It seems that the bill was not definite as to the testimony and the effect of it, so as to put the court in possession of the testimony to be passed upon. It does not show that defendant was injured or that it had a right to complain of the testimony, if it were in fact inadmissible. However, we can not say the testimony, as we find it in the statement of facts, was inadmissible.

Mr. Jones, in his work on Evidence, after laying down the general rule, that expressions of pain, such as moans, sighs, or screams, might be admissible (as res gestae), says the mere statement of a party, made long after the injury, that he suffered pain, ought not to be admitted as in any degree corroborative of his testimony as to the extent of his pain (under statute permitting the party to testify in his own behalf). "But," he says, "when a physician is called as an expert, his evidence is not thus limited. He may base his opinions upon statements given by the patient in relation to his condition and sensations, past and present. Thus only can an expert ascertain the condition of the party; and he may of course be guided to some extent by the data thus furnished. In support of the text he cites Aveson v. Kincird, 6 East., 188; Railway v. Sutton, 42 Ill., 438; 92 Am. Dec., 81; Roosa v. Loan Co., 132 Mass., 439; Quaife v. Railway, 48 Wis., 513.

In the case of Rogers v. Crain, 30 Texas, 284, opinion by Justice Coke, such testimony as we are considering was discussed. The court below

in that case excluded testimony in these words: "The negro woman informed me" (a physician) "that she had been suffering from profuse hemorrhage." This was objected to by the defendants, on the ground that the statements of the negro were not competent testimony, and the objection was sustained by the court. The court said: "We are of opinion that this ruling was erroneous. The witness Martin was a practicing physician, and this statement was made to him while visiting and treating the slave Clarissa professionally during her sickness. * * * Inquiries by medical men, and the answers to them, are evidence to show the state of health of the individual, and it is admissible from the very nature of the thing." The court, in the same opinion, also say: "If a narrative by the patient of a past or former condition, or of the earlier symptoms of the disease, the declaration should not be received in evidence, because then it is not an outward indication of the present existing fact, and consequently not a part of the res gestae." But the court also say: "The woman Clarissa, when she made the statement, was suffering from disease and was under the medical treatment of the witness, seeking relief, and though her language was that she 'had been' suffering from hemorrhage, yet it is evident that she referred to her then condition as one of the consequences of the hemorrhage, which brings the declaration within the rule. * * * The opinion of a medical man is evidence per se upon the state of a person's health, and the grounds of his opinion, which may be partly the answer of the patient to his inquiries, are admissible collaterally in evidence to support and explain his opinion."

The reasons given by the court sustaining the admissibility of the statement of the woman that she "had been suffering from profuse hemorrhage" will apply to the testimony in this case. The physicians whose testimony was objected to were treating the patient and forming a diagnosis of his case in order to know what to do for him. They wished to know what the condition of his health was at the time of the examination, and so, as Justice Coke said, the answers made by the patient are admissible from the very nature of the thing. The opinion decides the very point that a statement of past sufferings and symptoms by the patient is admissible; what was said in apparent opposition was not a question in the case. How long before the woman had had hemorrhage is not stated, but the court held it sufficient if it explained her present condition. Were not the statements objected to in this case explanatory of the then condition of the plaintiff—his condition at the time of the examinations mentioned in the testimony? The physicians were inquiring of him and examining him to ascertain what his disease was, and what it should be attributed to, whether disease plaintiff was subject to, or disorders that might have resulted from a physical shock. They were not allowed to testify as to what plaintiff told them, if anything, about the railroad accident, nor anything except his symptoms, as shown by the trial judge's added explanation of the bill of exceptions.

We believe the rule, as laid down by Jones, above quoted, is correct.

It is well supported by authority and reason, as well as the reasoning in the case cited from this State, and the case itself—the matter decided.

The plaintiff himself testified in this case, and affirmed under oath all that he had told the physicians from which their opinions were formed, thus making the record show the facts upon which their opinions rested, which opinions would have been receivable in evidence upon hypothetical questions based on his testimony. So if the testimony objected to was technically inadmissible it was not injurious. It was fully proved that their testimony of opinions formed was founded on the truth. The testimony supports their conclusions.

We do not believe there was error—at least, reversible error—in the ruling complained of.

Nor was there error in refusing the continuance applied for by the defendant on the ground of surprise—a real surprise. The cause was called for trial on April 7, 1896. Plaintiff's amended original petition was filed April 2, 1896, in which it was alleged that as a result of his injuries received in the collision he had become impotent and had diabetes. The ex parte depositions of plaintiff were filed and opened in court on December 6, 1895, in which he testified that as results of his injuries he had received he suffered entire loss of sexual desire and was afflicted with sugar in his urine, technically called diabetes. On December 11, 1895, plaintiff took out a commission to take the depositions of plaintiff, which depositions were filed in court December 13, 1895, and opened the same day. In these depositions plaintiff testified to the same facts as in his depositions taken by defendant, thus indicating that the matter testified to would be put in issue on the trial. Defendant must have known when these depositions were returned that plaintiff was preparing for the issues so made in the proof, and ought to have prepared to meet these issues before the case was called for trial. It had over three months in which to get ready with its testimony. The filing of plaintiff's amended petition was not defendant's first information that plaintiff would claim damages for these injuries stated. We do not believe defendant can claim surprise, under the circumstances stated. Burrow v. Brown, 59 Texas, 459.

The next and concluding point in the case arises upon the action of the court in denying the motion for a new trial based upon newly discovered evidence. The evidence discovered after the trial was cumulative, and its only tendency would be to mitigate the damages. This character of newly discovered evidence does not demand a new trial, and if it be denied the ruling will not be revised on appeal. Hatchett v. Conner, 30 Texas, 104-114; Ham v. Taylor, 22 Texas, 225; Railway v. Sciacca, 80 Texas, 356. Such motions are to a very great extent in the discretion of the trial court, and the appellate court will not reverse unless that discretion has been abused. Such applications are construed with great strictness. Mitchell v. Bass, 26 Texas, 372.

We are of opinion that the justice of this case has been attained

by the trial below and the judgment resulting therefrom. No good cause has been assigned for reversal, and it is our opinion that the judgment of the lower court should be affirmed, and it is so ordered.

*Affirmed.*

Writ of error was dismissed by agreement.