**RAILWAY EXPRESS AGENCY, Inc.**
**v. GRAY.**
No. 11791.

Court of Civil Appeals of Texas.
San Antonio.
Feb. 4, 1948.

Rehearing Denied March 3, 1948.

Trueheart, McMillan & Russell, of San Antonio, for appellant.

Charles J. Lieck and Reynolds N. Cate, both of San Antonio, for appellee.

NORVELL, Justice.

Railway Express Agency, Inc., has appealed from a judgment for $19,700 rendered against it and in favor of Cecil T. Gray. The appellant is a non-subscriber to the Workmen's Compensation Law. Article 8306 et seq., Vernon's Ann.Civ.Stats. The jury found that Gray was injured on November 1, 1946, as a result of the negligence of a fellow servant, Vincent Haas. See Article 8306, Section 2.

Appellant contends that the trial court erred in refusing to peremptorily instruct the jury to find for appellant and in overruling its motion for an instructed verdict. Further, appellant says that the jury's findings upon Issues Nos. 3, 4 and 5, are unsupported by any evidence as a matter of law, or, in the alternative, such findings are against the overwhelming preponderance of the evidence. No complaint is made by appellant as to the method of submitting the case to the jury, therefore, if the jury findings be supported by sufficient evidence, all of these contentions of appellant above stated are answered.

The basis of liability is the jury's answers to the following special issues:

Question No. 1: Do you find from a preponderance of the evidence that plaintiff was injured in handling said safes while working for the defendant on or about November 1, 1946?

Answer: Yes.

Question No. 2: Do you find from a preponderance of the evidence that in the course of handling the safes in question at the S. P. Depot the full weight of one of said safes was shifted to the plaintiff by his fellow employee?

Answer: Yes.

Question No. 3: Do you find from a preponderance of the evidence that such act, if it occurred, constituted negligence?

Answer: Yes.

Question No. 4: Do you find from a preponderance of the evidence that such negligence, if any, was a proximate cause of plaintiff's injuries?

Answer: Yes.

Question No. 5: Do you find from a preponderance of the evidence that the sole proximate cause of plaintiff's injuries, if any, was due to a risk inherent in the work of his employment, disconnected with any negligence on the defendant's part?

Answer: No.

The alleged liability of appellant is predicated entirely upon the testimony of the appellee. Appellee and his fellow servant Haas were the only persons present at the time appellee says he was injured. Appellee made no outcry, nor did he tell Haas that he had been injured. The effect of Haas' testimony was to deny negligence upon his part.

The issue of liability is close. The parties are unable to agree upon the evidence bearing upon the issue, making necessary an independent examination of the statement of facts on our part. From that investigation, we make the following statement of the facts relating to liability:

Haas and appellee, Gray, were experienced employees of Railway Express Agency, Inc. Gray was twenty-four years of age and had been employed by the company for about three years. Both he and Haas weighed around 150 pounds, and both had handled "portable safes" a number of times prior to the time Gray was injured.

These portable safes are constructed of iron and are 18 inches wide, 18½ inches deep and 32 inches long. A portable safe weighs about 620 pounds when empty. The express company uses these safes to transport and protect valuable property while in the course of shipment.

On the morning of November 1, 1946, Gray and Haas received instructions to pick up two or more portable safes at the Southern Pacific Station in the eastern part of the City of San Antonio and take

them to the International and Great Northern Railway Station, situated in the western part of San Antonio. They found the safes loaded upon a four-wheel express wagon. The floor of the wagon was about 36 inches from the ground and some two or three inches higher than the floor or bed of the motor truck which was to be used in transporting the safes to the I. & G. N. Station.

The four-wheel wagon was backed up to the truck. It seems that one of the safes was crosswise upon the wagon and was probably resting upon a ledge about two inches in height, which ran along the side of the wagon.

It was necessary to straighten the safe around so that it could be slid along the floor of the wagon and into the truck. Gray apparently attempted to do this by himself but was unable to do so and was finally assisted by Mr. Haas. Appellee stated that "I overlifted myself right then and there. Not thinking it was anything serious, I continued throughout this operation."

Gray and Haas then slid the safe down to the end of the wagon. Here they encountered a metal strip across the back end of the wagon floor. This occasioned some difficulty and made it necessary to do some lifting upon the heavy safe. Gray felt some pain in his back, but, nevertheless, continued working. The safe was then in a position to be slid off the wagon and into the truck, the floor of the latter (as above stated) being two or three inches below that of the wagon. Gray stood on the floor of the truck, took hold of the handle on the end of the safe and pulled the safe toward him, while Haas, standing on the floor of the wagon, pushed upon the safe.

It is obvious that when the safe had been pushed and pulled a certain distance over the ledge caused by the difference in elevation between the floors of the wagon and the truck, the safe would suddenly fall forward onto the floor of the truck, unless it were held back or weight placed upon the end of the safe remaining in the wagon. According to Gray, Haas, at this juncture, failed to hold back on the safe, or do anything to break its fall onto the floor of the truck, but took his hands off the safe, causing the weight thereof to fall entirely upon Gray, who had hold of the handle of the safe and was attempting to prevent the same from suddenly falling into the truck and kicking the four-wheel wagon back and away from the truck and letting the safe fall onto the ground.

Gray testified that he felt a sharp pain in his back when he and Haas were sliding the safe from the wagon to the truck, but said nothing about it. He rode with Haas to the I. & G. N. Station and helped unload the safes onto another four-wheel wagon and thence into an express car. At the I. & G. N. Station the four-wheel wagon was on a platform so that the floor thereof was about two feet above the floor of the truck. Gray and Haas had to up end the safes in order to unload them from the truck. This caused Gray to suffer more pain, but he thought he could possibly "work it out" so, after the completion of this work, he proceeded to deliver some air express shipments until the pain became so severe that he had to quit and go home.

■ While appellee's testimony is not entirely clear in all particulars, we think the above statement thereof is essentially correct and in accordance with the rule that every reasonable intendment of the evidence must be indulged in favor of the jury's findings. There is some confusion as to the lifting of the safes off the side ledges of the four-wheel wagon and lifting the safes over the end metal strip of the wagon. This, for the most part, seems immaterial in that it appears that appellee was injured, at least to some extent, prior to the time the weight of the safe was shifted to him, as found by the jury. It also appears that any injury he may have sustained by reason of the negligence of a fellow servant was aggravated by his continuing to work.

Appellant is insistent in its contention that the abolition of the defense of "assumed risk" by the Workmen's Compensation Act does not render the employer liable for injuries to an employee due to a "risk inherent in the work of his employment." As above pointed out, an issue embodying this defensive theory was sub-

mitted to the jury and answered unfavorably to appellant. It is contended that the jury's answer is without support in the evidence.

We think the controlling question may be simply presented by inquiring, (1) if Haas was negligent, and, if so, (2) was that negligence a proximate cause of appellee's injuries?

■ Under Article 8306, the negligence of a fellow servant is attributable to the non-subscribing employer. Injuries sustained through negligence of a fellow servant are not injuries "due to risks inherent in a given employment." West Lumber Co. v. Smith, Tex.Com.App., 292 S.W. 1103, 1105; St. Louis, Southwestern R. Co. of Texas v. Gillenwater, Tex.Com.App., 294 S.W. 193.

■ We are of the opinion that the evidence is sufficient to sustain the jury's finding that Haas' conduct in failing to keep his hands upon the safe at the time one of the ends thereof fell from the back of the wagon onto the floor of the truck did not measure up to the standard of ordinary care. We are further of the opinion that the jury could reasonably conclude that Haas could foresee that such conduct might result in injury to Gray. Immediately before and at the time the central part of the safe passed over the ledge and the drop into the truck occurred, Gray had hold of a handle thereof. He was pulling and then holding upon the handle to break the fall of the safe. When he was left without assistance and the heavy 620 pound safe suddenly dropped, it is reasonable to suppose that some injury would result. In other words, the jury were authorized to find that Haas could have reasonably foreseen that injury to Gray, or injuries similar in character would have resulted by reason of his conduct. Great Atlantic & Pacific Tea Co. v. Evans, 142 Tex. 1, 175 S.W.2d 249.

Gray's testimony showing that he was probably injured to some extent prior to the time the weight of the safe was shifted to him by his fellow employee * * * presents some difficulty. This prior injury, incurred while attempting to straighten the safe around so that it could be slid onto the truck, was unaccompanied by any negligence which could be attributed to appellant, as a matter of law, and no jury issues were submitted with reference thereto. The court's charge did not contain a special instruction with reference to prior injuries, that is, those sustained prior to those resulting from the alleged negligence of the fellow servant. Henwood v. Moore, Tex.Civ.App., 203 S.W.2d 973.

The circumstance of prior injury bears upon the question of negligence in that Haas, the fellow servant, obviously was not called upon or charged with anticipating that he was working with an injured or incapacitated man. Since Gray made no outcry, Haas could proceed upon the supposition that his fellow workman was able-bodied. But, even granting this, we are of the opinion that the jury could conclude that Haas should have known that his action in taking his hands off the safe at the crucial time indicated by the evidence, would probably result in injury to an able-bodied fellow servant. After due and studied consideration, we are constrained to hold that the evidence is sufficient in law and in fact to bring the case within the court's definition of negligence and proximate cause.

While this is essentially a fact case, the parties have cited numerous cases, which we have carefully considered. For us to set forth the statement of facts in certain of these cases and point out the similarity or dissimilarity of the facts therein when compared to this case, would unduly lengthen this opinion and serve no correspondingly useful purpose. We believe this case is distinguishable on the facts from Texas & Pac. Ry. Co. v. Rampy, Tex. Civ.App., 71 S.W.2d 387.

We overrule appellant's points Nos. 1 to 4, inclusive. St. Louis, Southwestern R. Co. of Texas v. Gillenwater, Tex.Com. App., 294 S.W. 193.

Appellant raises the question of jury misconduct. The members of the jury were brought back into court as witnesses upon the motion for rehearing and examined at length. Their testimony occupies about one hundred pages of the statement of facts. The complaint of misconduct in-

volves mention of attorney's fees and liability insurance during the jury's deliberations.

The trial judge found that no overt act of misconduct took place and that there was no discussion of attorney's fees and liability insurance prior to the time the jury had answered all the issues submitted to them. Thereafter some mention was made of how much the attorneys would probably get and how much the federal government would probably take for taxes. The foreman thereupon admonished the members of the jury that such matters did not concern them and had nothing to do with the case, whereupon the discussion was dropped. All of these occurrences took place after the jury had answered the issues and while they were waiting for the bailiff to return them to the court room. These findings have support in the evidence and are binding upon us. The court then concluded, as a matter of law, that the foregoing facts did not disclose probable injury to appellant. We approve this holding. We overrule appellant's points Nos. 5 and 6. Barrington v. Duncan, 140 Tex. 510, 169 S.W.2d 462.

Appellant's remaining points (Nos. 7 to 9, inclusive,) assert that the award of damages is excessive.

In answer to special issue No. 6 the jury found that $19,300 if paid presently, in cash, would fairly and reasonably compensate appellee for his injuries. In connection with this issue, the jury were instructed that they could consider physical and mental pain and suffering and loss of earnings up to the date of trial and impaired earning capacity in the future.

In a separate issue (No. 7) the jury found that $700 would reasonably compensate plaintiff for necessary medical expenses.

Judgment was originally rendered for $20,000, but appellee remitted $300 in the trial court, reducing the amount of recovery for medical expenses to $400 and the total award to $19,700.

In our opinion, the jury's award of $19,300 for pain and mental suffering and reduced earning capacity is plainly and patently excessive, so as to give rise to an inference of passion or prejudice on the part of the jury. The award is excessive in such an amount as to present a question of whether this Court should peremptorily remand the case or suggest a proportionately large remittitur so as to bring the award within a reasonable construction of the evidence. We have found recent authorities in which a remittitur approaching fifty per cent of the recovery has been suggested, and have, consequently, decided to follow that course.

With reference to Gray's injuries, the appellee testified as follows, according to his brief:

"That from the time he was hurt at the S. P. the pain continued to get worse—that he went on and did his work that morning, thinking his back would get all right. 'That I had a great pain in my neck and back, and I thought maybe a little work would possibly get it out' but it didn't, it got worse. When he came back he told the boss that he was in such pain that he would have to quit and go home. * * * He said that when he was on his way home the pain in his neck and back was so bad that he stopped at his sister's for a couple of hours and she gave him some liniment to rub on his neck and back, after which he went on home. When he got home he laid down, complained to his wife about an awful pain in his back and neck and when he took off his shirt she asked him if something had hit him in the back down between his shoulders and she rubbed him with the liniment, used hot towels, called a doctor, got instructions, used a hot water bottle, and his wife doctored him all day. There was a swollen place in his back as big as his hand. His back was sore, in fact awful sore and his neck also (indicating). He saw a doctor the next day. He says he went to this doctor who gave him some kind of shot and continued to give shots a good long while, for about 40 days. * * * He said that he did not get any relief from the shots, that he discharged this doctor and went to Dr. Stowell, who has worked on him ever since. And he went to Dr. Stowell every day for a week, then cut down to 4 times a week, then 3. At the time of the trial he was going to Dr. Stowell 2 times a week. He has been getting heat and massage

treatments to the back and also shots, but he only gets temporary relief from this treatment and when it wears off it just goes back to hurting him and is sore, and his back has been paining him all along below the neck and he never had this kind of trouble before, he was very husky. He has worked on truck line driving, before he went to work for Railway Express, but had never lifted 700 or 800 pounds. He was making $211.09 a month, but had earned nothing since November 1, 1946, up to the trial. His nerves have been awfully bad, his feet hurt him at times, and the doctor told him it was caused by his injury to the back. He can't sit down very long or lay around or anything like that, he has got to get up and move around. He cannot stand a lot of noise, he is restless, sleeps fairly well now, but had trouble sleeping after the accident for two or three months. He slept on an electric pad for two or three months, which sometimes got pretty hot. He says he has shown some improvement, but couldn't lift safes and wouldn't try it for all the money in the court room, that every doctor has advised against it and he is trying to improve his condition. * * * That he lost about twenty pounds."

Dr. I. T. Stowell, appellee's medical expert, testified that he was an osteopathic physician, a graduate of the Osteopathic School of Surgery and had been authorized to practice medicine and surgery in the State of Texas since 1931. Cecil Gray had been under his care for about six months, since the first part of December, 1946. Dr. Stowell stated that "he (Gray) presented his symptoms himself. He told me he had obviously injured his back while lifting more than he should, and he said he felt a pain in his back about the level or below the points of the shoulder blades, and that on exercising this pain was aggravated and that he couldn't bend or stoop or lift, and he complained of constant pain at that point, and, in fact, his entire back was lame and sore; and that was the complaint he presented. And on a physical examination I found his muscles were tense; and he complained of pain on pressure, especially between the shoulders and near the hip there that was lame, and in fact, he couldn't stand

erect and, in fact, he walked in a stooped fashion, and he wasn't able to stand up straight, he said it hurt him too bad. I X-rayed his back and found no evidence of a fracture—new or old—and there was no evidence of injury to the bones themselves.

"Q. Was there any evidence of arthritis at that time? A. No, sir, no evidence of arthritis at that time.

"Q. Or of neuritis? A. No, sir; I concluded from this examination that he had strained his back and that his muscles were sprained, and in his chest was a soreness and swollen, and there was a restriction of the main joints—these are kept from moving in a free manner; and it seemed that the injury occurred in the middle of the back, but the trouble was that it was sprained up and down the back; I can explain that to a certain extent—the spine that sticks out at the back side, the vertebrae are very close together, and in every motion they will jam the tissues that lie between these bones, and in that manner you will get an explanation of how it happened up and down the back; and also in heavy lifting the joints that support the vertabrae, they are small and I don't believe they are made for such heavy work, and they are cramped and are irritated under conditions like that, under that type of work, and that is very slow in clearing up, but they are real injuries in my opinion. * * *

"Q. What is the response his body has given to this treatment; has it been slow, the progression, has it been slow or fast? A. Very slow and unsatisfactory.

"Q. How do you account for that? A. Well, maybe I am impatient about people, but maybe these are slow.

"Q. Do you think he will ever be able to lift 300 or 400 pounds in weight? A. He should not attempt to, and I will say no, he might injure himself.

"Q. How long do you think it will be, doctor, before he will be able to go back to work; do you think he will ever be able to go back to work and do straight lifting? What is you opinion about that; do you think he will or will not? A. I think that he will be able to do light work in three or

four months, but I don't think he will ever be able to do any heavy work, and I have advised him not to attempt to.

"Q. What is your advice as to what is the limit he should ever attempt to lift? A. My advice is that he should never attempt to lift as much as 100 pounds, to stay under that weight.

"Q. That is, after he goes back? A. At any time. These old injuries are comparable to a strain and he will never get as strong as previously; they will never have their former strength."

On cross-examination Dr. Stowell testified as follows:

"Q. Mr. Gray has improved under your care? A. To a certain extent, yes, sir.

"Q. He declares himself to you as feeling very much better now than he did two months ago? A. He says he feels better, but he still complains; he is dissatisfied with the way he is getting along.

"Q. He is dissatisfied? A. Yes, sir.

"Q. He is sleeping better and is much less nervous? A. Yes, sir, he tells me he is.

"Q. And his general health you believe to have been improved, do you? A. Yes, sir.

"Q. And the fact is that his condition has improved during your care, hasn't it? A. He has improved some.

"Q. And as you expressed it, within a year, he will be more or less out of the woods with, maybe, requiring treatments only occasionally thereafter; is that right? A. That is correct.

"Q. And within as close as three or four months from now, in your judgment, he will be capable of going back to regular work? A. Not necessarily of the kind he was doing.

"Q. He might be lifting things less heavy than 100 pounds? A. Yes, sir, if he goes back to light work, but he will not be free of pain at that time. I believe he will have to go into some type of light exercise to develop his muscles."

Dr. Edward A. Cayo, a specialist in bone surgery, called by appellant, testified that he had examined appellee and made X-ray pictures of his spine. From this examination Dr. Cayo concluded that there was no evidence of injury involving the joints, nor diseased condition involving them, and no pinching of the spinal column; that the condition, whatever it had been, was healed.

■ Appellee contends that "medical evidence is not essential to plaintiff's recovery and he can make his case on his own testimony alone, and also on lay testimony." This, of course, is true, but medical testimony to the effect that a person has no bone injury, no neuritis and no arthritis is not evidence that such person is suffering from one or more of said ailments. What the evidence here indicates is a severe muscle injury. This seems to be Dr. Stowell's view and Dr. Cayo seems to be in substantial agreement with him. Muscle injuries generally heal, although the muscle may not be as strong as before injury, and scar tissue may interfere somewhat with the normal functioning of the muscles.

Dr. Stowell believes that Gray is improving, although he describes his progress as slow. However, in connection with this statement it should be borne in mind that Gray had been under Dr. Stowell's care for about six months. The doctor further stated his belief that in a year (presumably from the date of the trial, June, 1947) Gray would be more or less "out of the woods." Eighteen months or two years may be properly designated as a "slow recovery," but the award allowed here, without discount for present payment, would amount to about eight times Gray's annual wage at the time he was injured.

■ An award of damages like any other issue tried to a jury must have support in the evidence. While there may be evidence of a permanent injury, the record will not support a conclusion that Gray is totally incapacitated from engaging in a gainful occupation, either permanently or for a period of many years.

■ Considering appellee's testimony, that of his lay witnesses, his doctor, his described appearance at the time of the trial, we have come to the conclusion that the evidence will not support an award of more than $12,000 for mental and physical pain and suffering, lost earnings and impaired earning capacity.

In accordance with Rule 440, Texas Rules of Civil Procedure, we suggest a remittitur of $7,300. If appellee files such remittitur within fifteen days from date hereof, the judgment will be reformed so as to award appellee a recovery of $12,400, otherwise the judgment will be reversed and the cause remanded for new trial. Henwood v. Moore, Tex.Civ.App., 203 S.W.2d 973; Kimbriel Produce Co. v. Webster, Tex.Civ. App., 185 S.W.2d 198; Callahan v. Hester, Tex.Civ.App., 181 S.W.2d 294.

Affirmed on condition of remittitur.

On Motion for Rehearing.

Appellee having filed a remittitur of $7,-300, as suggested by us, the judgment of the trial court is reformed so as to allow appellee, Cecil T. Gray, a recovery of $12,-400 against appellant, Railway Express Agency, Inc., together with interest thereon from June 20, 1947 (the date of the judgment in the trial court), until paid, at the rate of six per cent per annum.

The award of costs in the trial court against the appellant is also affirmed. Costs of appeal are taxed against the appellee.

Appellant's motion for rehearing is overruled.