Guy A. THOMPSON, Trustee, Beaumont, Sour Lake & Western Railroad Company, Appellant,

v.

James H. QUARLES, Appellee.

No. 13015.

Court of Civil Appeals of Texas.

Galveston.

Dec. 13, 1956.

Rehearing Denied Jan. 3, 1957.

**322**

Hutcheson, Taliaferro & Hutcheson, Woodul, Arterbury & Wren and Howard S. Hoover and Carroll R. Graham, Houston, for appellant.

Helm, Jones, McDermott & Pletcher and George E. Pletcher and Albert P. Jones, Houston, for appellee.

GANNON, Justice.

Suit under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., by James H. Quarles, appellee, against Guy A. Thompson, Trustee of Beaumont, Sour Lake & Western Railroad Company, appellant. Plaintiff sought damages alleging that while employed by defendant as an electrician's helper, he accidentally sustained personal injuries resulting from negligence on the part of defendant's other employees. Plaintiff had judgment on special jury findings for $50,213, with interest and costs, and this appeal follows. Appellant asserts the following errors: (a) misconduct of two of the jurors in failing to divulge material information on voir dire examination, (b) excessiveness, (c) the entire want of any evidence to sustain, and (d) the factual insufficiency of the evidence to sustain actionable negligence.

Plaintiff's theory of the facts is reflected by the following from the petition: "At or about the hour of 8:30 o'clock a. m. on April 16, 1953, your plaintiff was working on a Diesel [locomotive] engine. As he was jacking over the engine [generator] on the Diesel, which was known as Engine 549A, a switch engine hooked onto the Diesel on one end thereof with considerable force and violence. This was done without notice or warning to your plaintiff. When the switch engine bumped the Diesel, the jack was caused to slip and your plaintiff was thrown against the side of the engine and its beams. As a result of this incident, your plaintiff was caused to injure his back. The incident out of which this suit arises resulted from the negligence and carelessness of employees and representatives of the defendant, other than your plaintiff, * * *." By other allegations plaintiff pleaded negligence in several particulars, but he went to the jury only on

a claim of negligence in that the switch engine coupled onto the Deisel locomotive while plaintiff was working on it without prior warning to plaintiff.

Defendant pleaded a general denial; a special denial of his own negligence; contributory negligence; that plaintiff's negligence was the sole proximate cause of his injuries, and unavoidable accident. But defendant's primary and principal defense was that no accident such as alleged by plaintiff occurred.

The verdict finds: (1) that at the time of and immediately before the occurrence of April 16, 1953, the engine upon which Quarles was working was coupled onto by another engine; (2) that such coupling caused bodily injury to Quarles; (3) that such coupling was made without warning; (4) that the failure to warn Quarles was negligence; (5) that such negligence was a proximate cause of the occurrence of April 16, 1953; (6) that the act of coupling onto the engine while Quarles worked thereon was negligence; (7) that such negligence was a proximate cause of the occurrence of April 16, 1953. By answers to other issues the jury exonerated plaintiff from any concurring negligence and found that "the accident in question" was not an unavoidable one. The jury fixed damages, exclusive of medical expense and resulting, and to result, from past and future physical pain and mental anguish and past and future loss of earning capacity, at $50,000.

Defendant first says that he was deprived of a legal trial before a fairly constituted tribunal because of the failure of two of the jurors—R. C. Bomer and Lynn Chambers—to divulge material information on voir dire examination so as to enable defendant intelligently to exercise his peremptory challenges.

Following a hearing of the motion for new trial, at which considerable evidence and testimony of the jurors was introduced, the trial court made findings in respect to the voir dire jury panel proceedings. These show the nature and extent of the interrogation of the jury. The findings are not attacked and reveal that on the voir dire neither plaintiff's counsel nor counsel for defendant inquired generally of the panel, or of any particular juror, as to whether the members of the panel had had—generally speaking—claims for personal injuries; that the only general question propounded with reference to "injuries, claims or law suits" was limited to a question inquiring whether the members of the panel had been or were then involved *in a law suit themselves,* whether as plaintiff or defendant; however, an exception under a further finding is that counsel for defendant did inquire of, the panel as a whole whether any of them "had had a claim or a law suit *for a back injury."* But the court found specially that neither the juror Lynn Chambers nor the juror R. C. Bomer was questioned by either counsel for plaintiff or counsel for defendant with reference to whether or not he had had any other injuries or claims. There is a further finding that no questions were asked of the panel generally or of the jurors individually in respect to law suits, of friends or relatives. The findings in part, read:

"VI.

"Said Lynn L. Chambers, who was a member of the jury panel in this case and who later served as a juror in this cause, had, prior to the trial of this cause, sustained personal injuries and filed claims therefor, as follows:

"(a) The said Chambers sustained a personal injury on March 1, 1951, while employed by George Rackle & Sons. The injury consisted of a mashed thumb. He filed a claim for compensation which was settled for $1250.00 plus $700.00 compensation for 28 weeks. * * * He was represented by an attorney.

"(b) The said Chambers sustained a personal injury while employed by Port Houston Roofing Company. The injury occurred May 24, 1950 when he fell off of a building and broke both feet. He filed a claim for compensation which was settled for $1600.00 plus $600.00 compensation for 24 weeks. * * *

"(c) The said Chambers sustained a personal injury on August 17, 1948, while employed by Lydick Roofing Company, when he broke his arm. As a result thereof he was off work from August 18, 1948, to November 24, 1948. He filed a claim for compensation and was paid at the rate of Twenty five ($25.00) Dollars per week for nine weeks, and in addition he was paid One hundred thirty five ($135.00) Dollars in compromise settlement of the claim. * * *"

"X.

"R. C. Bomer, who was a member of the jury panel in this cause had, prior to the trial of this case, sustained personal injuries, as follows:

"(a) The said Bomer sustained an injury to his back while riding a Houston Transit Company bus, in Houston, Texas, on June 25, 1954, when the bus suddenly stopped and by reason of the sudden stop Bomer was caused to be thrown to the floor of the bus. The said Transit Company paid Bomer Forty ($40.00) Dollars and paid his doctor bills and Bomer executed a release.

"(b) The said Bomer sustained personal injuries when a truck he was operating turned over on February 9, 1950. As a result of said accident he was off work three days. His doctor bills were paid and his salary was continued the three days. A claim for compensation signed by the said R. C. Bomer, was filed with the Industrial Accident Board as a result of the injuries sustained by the said Bomer on the occasion in question and also a settlement receipt for $10.00,

signed by the said Bomer, was filed with the Industrial Accident Board. * * *.

"(c) The said R. C. Bomer has three brothers, one of whom had, at the time of the trial of this cause, a suit pending in Harris County, Texas, wherein he was seeking to recover Seventy Five Thousand and no/100 ($75,000.00) Dollars for injuries to his back. * * *. Another brother of the said R. C. Bomer had a claim for damages for personal injuries which he received in the territory of Alaska. That claim was settled without a law suit. The said R. C. Bomer at the time he was being interrogated on voir dire examination was aware of both the claim of one brother and the pending law suit of the other brother.

"(d) The said Bomer did not, at any time during the voir dire examination of the jury panel or during the trial of the cause reveal that he had sustained the personal injuries set out in 10 (a) and (b) above, or the information set out in (c) above. * * *"

"IV.

"During the examination of the sixteenth juror on the panel, George D. O'Sullivan, he made a remark which was in substance that he was skeptical about back injuries. At this time several of the jurors on the panel spontaneously volunteered that they themselves had sustained certain types of injuries. At this time the juror, Lynn Chambers, held up his hand, exhibiting a partially amputated thumb, and, upon questioning by plaintiff's counsel with reference to the injury, stated it would not make any difference to him in serving as a juror."

So it appears that the jurors were not questioned generally in respect to *all prior claims* for personal injuries, but only in respect to past or present *law suits* based thereon; except that one of the attorneys for defendant did inquire

of the panel as a whole whether they or any of them had had a claim or a law suit for a "back injury". It is specifically found that the juror Lynn Chambers was not questioned with reference to injuries other than back injuries, and the same is true of the juror R. C. Bomer. It further appears that none of the jurors was questioned generally or individually in respect to law suits of friends or relatives. In this state of the record defendant's claim that the general setting and atmosphere of the voir dire examination was such that the jurors must have known that defendant's counsel was interested in the claim and injury history of each of the jurors and in that of their friends and relatives, and that under pain of being charged with concealment they should have volunteered full information thereon, is, in our view, untenable and does not supply the indispensable requisite that direct and specific questions with reference to desired information must be addressed to jurors before complaint of failure to divulge material information on voir dire will be entertained. Liberty Cab Company v. Green, Tex.Civ.App., 262 S.W.2d 522; Roy L. Jones Truck Line v. Johnson, Tex.Civ.App., 225 S.W.2d 888; Myers v. Continental Panhandle Line, Inc., Tex.Civ. App., 278 S.W.2d 365. This Court held in McCarthy Oil & Gas Corp. v. Cunningham, Tex.Civ.App., 255 S.W.2d 368, that before one may complain of a juror's concealment of his antecedents, the burden is on the complaining party not only to ask direct questions but to see that each juror hears them.

On the facts as found by the trial court, we feel that the only substantial question in respect to the failure of any juror to reveal information arises on the testimony of the juror Bomer showing that he had sustained a previous back injury while a passenger on a Houston Transit Company bus and had executed a release therefor. Defendant's showing on which he bases his claim of Bomer's improper concealment is as follows: Bomer testified that while a passenger on a Houston Transit Company bus it stopped suddenly and caused him to fall to the floor in a twisted position and strain his back. At the time the bus operator handed him a slip titled "Courtesy Card", on which the following appeared: "I am required to report the details of any unusual incident which occurs. Your comments *will enable the management to treat my driving record fairly and I will greatly appreciate your name and address and any comments you care to make.*" (Emphasis supplied.) The card contained blank spaces for the insertion of the recipient's name, address, business address, phone numbers, and a space for "Remarks". Below this there was printed on the card the words "Thank you. Your Bus Operator." Bomer filled out the Courtesy Card, giving his name and address, and included the following "Remarks": "Bus stopped suddenly, causing me to fall to floor in twisted position." Asked at the hearing if he had ever had a claim for injuries against the Houston Transit Company, Mr. Bomer stated: "I didn't have a claim, no, sir." Asked if he had filed a claim for damages, he answered: "I made out an accident report." This referred to the courtesy card. Bomer testified to the events which gave rise to his execution of a release and the receipt by him of the sum of $40 as well as payment by the Transit Company of a smaller additional amount on account of doctor's bills incurred in the treatment of his back. Asked if the Transit Company had settled with him, he stated: "They came out on Monday and said they thought I was entitled to a little money on that. That anybody as nice as I had been was entitled to a little money." The foregoing is the testimony, and all the testimony, upon which defendant asserts that the juror Bomer improperly concealed the fact that he had had *a claim or law suit* for a back injury.

We do not think the proof shows that Mr. Bomer ever asserted a claim for a back injury. The most it shows is that before Mr. Bomer ever took the time or opportunity to assert a claim the company came to him and voluntarily offered to pay $40 and his doctors' bills, conditioned on Bomer executing a release of *possible* claims. This Mr. Bomer did and received the money. This does not establish that Mr. Bomer asserted a claim for a back injury. The word "claim", in the sense here used, is properly defined as "to demand on the ground of right". The word connotes affirmative action and is inconsistent with the passivity in which the proof places Mr. Bomer.

■ But, if in any view it can be said that Mr. Bomer once asserted a claim for a back injury, still his innocent concealment of that fact does not in and of itself show probable injury. True, there is testimony by Mr. Bomer—somewhat indefinite—that he has had some slight trouble with his back since the injury, but it appears that this is not disabling since Mr. Bomer is now regularly employed and serving as a peace officer. We cannot hold, on the mere fact that Mr. Bomer had a minor back injury and on that account received a small payment, that he was thereby rendered suspect as a juror who would be fair and impartial to defendant, or that he would probably be biased towards plaintiffs in such cases as the present. The implication might be said to point the other way; i.e., to the thought that Mr. Bomer is not claim conscious and is not unfavorably inclined toward any party involved in personal injury suits, whether plaintiff or defendant. We are governed by Childers v. Texas Employers' Insurance Association, 154 Tex. 88, 273 S.W.2d 587, 588, departing from the contrasting rule announced in — Texas Employers' Ins. Ass'n v. Wade, Tex.Civ.App., 197 S.W.2d 203; Traders & General Ins. Co. v. Cossman, Tex.Civ. App., 212 S.W.2d 865; and Dallas Ry. & Terminal Co. v. Kurth, Tex.Civ.App., 247 S.W.2d 930, and holding that under Rules 327, 434, and 503, T.R.C.P., "The failure of the juror on his voir dire examination to disclose information that he had suffered previous injuries is not the test * * *, unless the evidence shows that he concealed the fact of previous injury * * *, *and that such action resulted in probable injury* * * *." (Emphasis supplied.)

Defendant next assigns that the verdict is excessive. The proof shows that prior to the accident neither plaintiff nor defendant suspicioned a latent defect in plaintiff's spine known as spondylolisthesis. The defect consists of one vertebra slipping forward on another. In Quarles' case his fifth lumbar vertebra was slipped forward on the sacrum. Spondylolisthesis predisposes to serious disabling back injury. One in that condition may go for years withstanding considerable strain, and then for no assignable reason sustain serious injury from a relatively light trauma. There is no dispute among the medical witnesses that at the time of the trial and at all times intervening since the accident plaintiff suffered from a seriously disabling back condition; but there is a sharp dispute in respect to whether a full and satisfactory remedy of the condition is often to be had by surgery through a bone graft fusion of the vertebra at the site of the spondylolisthesis.

All defendant's doctors testified to the high probability of a complete cure by operation. Defendant's witness, Dr. Edward T. Smith, testified that in spondylolisthesis operative procedure is successful in about 80% of the cases, the remaining 20% being unsuccessful. In case of failure, i. e., where the attempted fusion is unsuccessful, a re-fusion has to be tried. Dr. Frank Parrish, another medical witness for defendant, had examined plaintiff. He testified that spondylolisthesis is seen often; that some in which the condition looks bad apparently are not bothered, "so it is *a little diffi-*

*cult* on one visit or two to recommend very vigorously anything *as radical* as an operation." (Emphasis supplied.) However, Dr. Parrish testified that in plaintiff's case, since he had failed to improve under conservative treatment, the only possible solution was an operation, described by him as "a pretty good sized operation" which neither he nor any other doctor could guarantee. According to Dr. • Parrish the doctors only go on averages, which run 80 to 90% in favor of success. As the doctor put it, "We expect excellent results *if we get solid union.*" (Emphasis supplied.) All of defendant's medical witnesses testified that if plaintiff were successfully operated he would have no residual disability and would be able to resume hard manual labor at the expiration of about a year from the date of the operation. The claim of excessiveness is bottomed on the assumption of the inerrancy of this testimony, from which defendant argues that, as a matter of law, any pain or disability in plaintiff, past the time it would take him to convalesce from an operation, is not legally attributable to defendant's negligence but rather to plaintiff's negligence in refusing an operation.

■■■ Under the authorities one may not recover damages which can be avoided by submission to medical treatment, including operative procedure, when under similar circumstances a man of ordinary prudence would submit to such procedures in his own interest. However, what a man of ordinary prudence would do under stated circumstances is ordinarily a question of fact—rarely, if ever, a question of law. Negligence vel non in refusing to submit to surgery is to be judged in relation to the risks and pain involved, including that from general anesthesia, the possibility of failure, or that the injured condition may be made worse, etc. Here the record is not too well developed on these matters, but we take it any operation involving the spine is a radical one with no positive assurance of safety. Surely such a radical operation would involve considerable pain, and defendant's testimony shows a substantial possibility of failure. There would be defensible ground on defendant's evidence alone for us to hold, as a matter of law, that plaintiff was not required to submit to an operation for his spondylolisthesis. See the cases reviewed in 48 A.L.R.2d at pages 376 et seq., including Ballard & Ballard v. Pelaia, Fla., 1954, 73 So.2d 840. In that case the evidence showed that spinal fusion operations are successful only 65% of the time, and it was held that plaintiff was not required to submit to a spinal fusion operation. Additionally, in this case defendant's presentation ignores material relevant evidence coming from plaintiff's expert witness, Dr. Alexander E. Brodsky, a qualified and experienced orthopedic surgeon, who had plaintiff under his care from October 7, 1953, down to the date of the trial in December of 1955. Dr. Brodsky diagnosed plaintiff's condition as low back sprain, superimposed upon and emanating from mechanical instability due to spondylolisthesis, and probably nerve root pressure causing irritation at the junction of the fifth lumbar vertebra and the sacrum. Dr. Brodsky testified that spinal fusions for the repair of spondylolisthesis are not always successful and that some who undergo them are made worse, though most are benefited. He said, "Actually our statistics are pretty jumbled up and you are lucky if you can get an honest figure as to how many fuse and how many do not." He had observed hesitancy among his patients about submitting to spinal surgery. He testified that even were plaintiff successfully operated certain changes would occur in the nerve root which would not be subject to repair. He testified that a fully successful operation would leave plaintiff with a degree of permanent disability. Dr. Brodsky put it thus: "It is a rarity that after a major fusion a man will go back to heavy work, even with a successful fusion. Once

in a while you will find one that will, in an extremely stable individual, who has a lot of desire, but *a majority of them will have a permanent reduction in their work level.*" (Emphasis supplied.) Dr. Brodsky stated that "the only real cure" for plaintiff's condition was a fusion operation, but qualified this by stating he meant only improvement and benefit. Looking at all the evidence, it seems apparent to us that the question of whether ordinary care and prudence required plaintiff to submit to surgical procedure was at most one of fact and that there would be no justification for us to hold, as a matter of law, that plaintiff was required to submit to a spinal graft and fusion and is therefore barred from recovering any damages which the probabilities may indicate would be avoided were the operation to be successful. When we look to all of the evidence and assume, as the jury was entitled to do, that Dr. Brodsky's opinion was the correct one and that plaintiff will never again do heavy manual work, even following a successful spinal fusion, we cannot say that the verdict is excessive. Assuming the correctness of Dr. Brodsky's opinion, it is manifest the damages are not legally insupportable as plaintiff in any event will always be seriously handicapped in obtaining and retaining the employment for which he is best fitted. When injured plaintiff was twenty-three years of age, with a life expectancy of 43.88 years. He had only an eighth grade schooling. He entered defendant's employ about age twenty-one as an electrician's helper, in which status he remained until he was injured. His earnings averaged about $70 per week. His injuries have been very painful and may continue to be for the balance of his life. Plaintiff's efforts at salesmanship, to which he has turned since his injury, have been practically fruitless. He first tried peddling trading stamps to merchants on commission, with no profit. He next tried selling silverware, house-to-house. During about a month he sold only two sets. He then went to work at Weiners as a shoe clerk, where he remained three or four weeks, but was laid off because his poor physical condition did not permit him to feel like working. In 1954 his earnings totaled about $800. In 1955 plaintiff worked as a shoe clerk at Schiffs Shoes, Sax Shoes, and later Danburgs. He was laid off at all three places. This work required a good deal of bending and it hurt him. His attempts to find other employment were a failure. He suffers pains in his back, radiating down his legs. He has to sleep on a hard bed and seldom gets a good night's rest. His pain has made him nervous and short tempered. He worries over not being able to make a living for his family, and his emotional condition and bad temper have resulted in family difficulties. Plaintiff's average annual earnings prior to his injury were $3,360. This earning capacity is presently all but wiped out. While the verdict is large, still we cannot say that it is legally excessive. Looking at the evidence viewed in its most favorable light from plaintiff's standpoint, the verdict is amply supported. The vice in defendant's position lies in his assumption, contrary to the cases, that he is entitled, *as a matter of law,* to the probability that operative procedure would restore plaintiff to his former earning capacity, free of disability, pain and suffering. Under the facts of this record the question of mitigation of damages, as that expression is used and explained in the books, was solely for the jury if it was in the case at all. Defendant's position on the issue has been factually resolved against him, and the verdict must stand.

Defendant next contends that the jury verdict finding him actionably negligent in coupling onto the Diesel locomotive, while Quarles was working on it and without warning, is without any evidence to support it; or, alternatively, so con-

trary to the overwhelming weight of the evidence as to be manifestly wrong. Defendant states these contentions as follows:

"Defendant's contention under this point is simply that since there is no evidence in the record tending to show that the negligence found by the jury would cause any injury to a person whose back which was not more than ordinarily susceptible to injury, and since defendant is entitled to assume that his employees are able-bodied, he could not foresee that the acts, which the jury found to be negligent on the occasion in question, would cause any injury. Since the defendant could not foresee any injury the acts found by the jury to be negligence cannot, as a matter of law, be negligence or a proximate cause of the injury. Foreseeability is one of the requirements of both negligence and proximate cause."

█ In support of his contention defendant refers us to the medical testimony, from which it is inferable—and not denied by plaintiff—that but for predisposing spondylolisthesis, defendant's act of coupling onto the car without warning while plaintiff was working on it would have resulted in only minor injury to plaintiff; and he cites us to authorities which hold that a master is not liable for injuries sustained by employees as a result of predisposing physical infirmities while at work under safe conditions; that is to say, at tasks and under circumstances not calculated to produce any harmful result to able-bodied employees. These authorities are: Haywood v. Galveston, H. & S. A. Ry. Co., 38 Tex.Civ.App. 101, 85 S.W. 433; Galveston, Houston & S. A. Ry. Co. v. Bonn, 44 Tex.Civ.App. 631, 99 S.W. 413; Swann v. Texas & P. Ry. Co., Tex. Civ.App., 200 S.W. 1131; and Railway Express Agency, Inc., v. Gray, Tex.Civ.App., 211 S.W.2d 1013. We do not think defendant's authorities are applicable because they treat of foreseeability as applied to negligence rather than of "legal" foreseeability

as applied to causation. We think that in this regard defendant's contention conflicts with late and respectable out-of-State authority, and with decisions of our Supreme Court, and of the Commission of Appeals.

15 Am.Jur., Damages, Sec. 81, page 490, reads: "The general rule seems to be that where the result of the accident is to bring into activity a dormant or incipient disease, or one to which the injured person is predisposed, the defendant is liable for the entire damages which ensue, for it cannot be said that the development of the disease as a result of the injury was not the consequence which might naturally or ordinarily follow as a result of the injury, and therefore, the negligent person may be held liable therefor. In other words, if a latent condition itself does not cause pain, suffering, etc., but that condition plus an injury caused such pain, the injury, and not the latent condition, is the proximate cause."

The text is fully supported by Owen v. Rochester-Penfield Bus Company, Inc., 1952, 304 N.Y. 457, 108 N.E.2d 606, 608, 33 A.L.R.2d 1354. That was a suit to recover damages resulting from severe frostbite of both feet which the plaintiff, a passenger on defendant's bus, had sustained due to failure of the bus line to keep its bus properly heated. The plaintiff recovered a judgment but the appellate division reversed, holding that since a poor circulatory condition in plaintiff, attributable to a heart condition, rendered her more susceptible to frostbite than a person in normal health, defendant was not liable, as a matter of law, because the *particular* injuries did not come within the realm of reasonable foreseeability. However, the Court of Appeals reversed the appellate division and affirmed the trial court. Speaking of the opinion of the appellate division, the Court of Appeals said: "We do not agree with this view here. * * * It is common knowledge that many people are subject to low blood pressure and poor circulation and certainly this is foreseeable by a common carrier. We have held that 'a defendant is

chargeable for all the harm and suffering which his negligent act brought on even though the plaintiff's injuries were aggravated by his own predisposition or weakness. * * *.' Poplar v. Bourjois, Inc., 298 N.Y. 62, 67–68, 80 N.E.2d 334, 337. The jury here had the right to find upon the above-recited facts that defendant failed to furnish reasonable heat to plaintiff, in consequence of which she suffered frostbite.

"In the circumstances disclosed, we cannot say as a matter of law, as did the Appellate Division, that plaintiff's injuries did not come within the realm of reasonable foreseeability."

In Driess v. Friederick, 73 Tex. 460, 11 S.W. 493, our Supreme Court had before it a judgment for damages for personal injuries sustained by plaintiff when he broke his leg in walking over a grating on defendant's sidewalk. The testimony showed that plaintiff had previously broken his leg in the same place. The defendant assigned as error the refusal of the court to give an instruction reading in part as follows: " * * * you cannot find * * * for any damages proximately resulting from a previous injury or *defect in the injured limb.*" (Emphasis supplied.) The instruction was held properly refused. The opinion states: "The evidence tends to show that the limb of appellee, about 16 years before the injury of which he complains, was fractured at about the same place as in the last injury, but that from this he had so far recovered as to be able to use it without inconvenience. The evidence, however, shows that *by the first injury the bone was weakened, and more easily fractured at the time of the injury complained of than it would have been had not the first fracture occurred.* * * * The charges given withdrew from the jury any impression they otherwise might have entertained that they could award damages for any injury not proximately caused by the negligence of appellants, which was all they could ask, and to have given the latter part of the charge refused would have been misleading.

If, by the charge asked, appellants desired the jury to understand that appellee would only be entitled to recover damages on account of the injury received through appellants' negligence, which would have resulted *had his limb not been before fractured*, then the charge, which might have been so understood, was properly refused. (Emphasis supplied.)

"The damages which appellee was entitled to recover were the damages resulting to himself, *conditioned as he was at the time of the injury*, and not such damages as he might have been entitled to had his condition been different. That the injury resulting from the negligence of appellants may have been aggravated or more easily caused by reason of the fact that the limb had received a former injury cannot affect the question of right to or measure of damages. Had the latter part of the charge refused been given, the jury would probably have felt authorized to inquire *whether the injury would have occurred at all if the weakness from the former injury had not existed*, which would not have been proper if the injury *in fact* resulted from the negligence of appellants." (Emphasis supplied.)

That, as said in City of Dallas v. Maxwell, Tex.Com.App., 248 S.W. 667, 27 A.L.R. 927, our courts seek as far as possible *to avoid metaphysical and philosophical niceties in the age-old discussion of proximate causation*, is borne out by the opinion of the Commission of Appeals in Collins v. Pecos & North Texas Railway Co., 110 Tex. 577, 212 S.W. 477. There the actual holding is that where, as here, some injury is foreseeable from conduct and it is therefore negligent, a defendant must respond in damages for results actually unforeseeable because never before known to ensue from such conduct. Compare the opinion of the Court of Civil Appeals, 173 S.W. 250.

We think the Driess and Collins cases are applicable and controlling and we overrule defendant's contention.

Lastly, the defendant invokes our power to review the finding that plaintiff was injured as a result of the switch engine coupling onto the Diesel locomotive, and defendant asks us to set aside this finding as plainly wrong, manifestly unjust, and contrary to the overwhelming weight of the evidence. In order to do this we must reach the conclusion on the evidence in its entirety, that of plaintiff as well as of defendant, that no impartial, fairminded jury should have found the issue against defendant. The test by which we are governed in exercising our fact jurisdiction is not satisfactorily established, but we apprehend it to be our duty to leave jury fact findings undisturbed unless on the whole record we find them shocking to the conscience. Under this point defendant does not say there is no evidence to support the verdict, but only that the verdict reflects bad faith, as it were, and bias and passion in plaintiff's favor. In performing our function under this point, we have reviewed the entire record as thoughtfully and carefully as we know how. Having done so, we reach the conclusion that the point is without merit.

Plaintiff's theory of the facts is clear and simple. It is evidenced by the excerpt from the petition set out earlier in this opinion. Plaintiff's testimony fully supports his theory. On the other hand, defendant's theory that the accident did not in fact happen appears to us to be inconsistent with much of defendant's own proof. According to some of defendant's witnesses plaintiff sustained his injury before the coupling took place; according to others, after the coupling had been made and the Diesel locomotive upon which plaintiff was working had been moved to another location and come to rest there. It is defendant's claim that plaintiff's injuries were not caused by any movement of the locomotive upon which plaintiff was working when the coupling was made. This defendant supports by the testimony of certain witnesses who impeach themselves by admitting having given prior written statements to plaintiff's attorneys corroborative of and consistent with plaintiff's theory of the facts. Actually, defendant's main support for his contention under this point are certain extra-judicial statements, two in writing and others verbal, made and claimed to have been made by plaintiff and, which it is said, show beyond all reasonable doubt that plaintiff's injury resulted solely from over-exertion. If these written statements are susceptible of the construction which defendant places upon them—and they are not without ambiguity when applied to the full proof—then they collide with prior consistent statements to which defendant's own witnesses testified. Actually, one of the verbal statements claimed to have been made by plaintiff and said to be inconsistent with his theory of the facts is said to have been made *after* plaintiff filed his petition, in which he alleged affirmatively and distinctly that he was injured when the locomotive upon which he was working was coupled onto by a switch engine. The proof of this verbal declaration or admission against interest, testified to by one of defendant's medical witnesses, it seems to us, comes heavily freighted with suspicion and casts a long shadow over defendant's other proof of similar declarations of plaintiff made in writing. The written statements in each case were taken by parties identified with defendant. One was taken by an office assistant of a railroad doctor. Plaintiff testified this assistant changed the statement around three times before it was finally signed. Defendant did not produce or account for the absence of the witness who took the statement. Another written statement taken by defendant's claim agent was, according to plaintiff, finally drafted only after, when, as plaintiff would put the matter one way, the claim agent would say, "Let's put this another way." All of defendant's own proof shows that plaintiff was working inside the Diesel locomotive when the switch engine coupled onto it, and that this was contrary to defendant's rules which required men working inside a locomotive to get down off of it and onto the

ground before the coupling would be made. This was testified to by defendant's master-mechanic. However, all doubt in our minds with respect to our duty to leave the verdict undisturbed is removed by testimony of one of defendant's witnesses concerning a prior consistent statement made by plaintiff, and this almost in the nature of res gestae. Mr. J. C. McLeod, a machinist in the employ of defendant, who was working as a member of the crew of which plaintiff was a member, testified that he was on the engine the morning of the accident and saw Quarles jacking over the Diesel generator; that he, the witness, got down off of the Diesel to get some water and had gone about 30 feet when the coupling was made, and we quote:

"Q. And that you left the Diesel and went around and were standing on the ramp? A. Yes, sir.

"Q. From where you could see the Diesel engine? A. Yes, sir.

"Q. And the switch engine came along and hooked onto the north end of the Diesel and pulled it on out? A. Yes, sir.

"Q. You testified about taking it to the 'Wye'. Didn't you say, 'Quarles got off and told me he hurt his back *when the switch engine bumped the Diesel*'? (Emphasis supplied.) A. Yes, sir.

"Q. Causing the jack to slip and he fell against the wall? A. Yes, sir."

Another of the witnesses relied upon by defendant to overcome plaintiff's testimony was O. D. Taite. Taite was an electrician and plaintiff was his helper. This witness testified on *direct* examination that plaintiff's work of jacking over the generator on the Diesel was not done until *after the locomotive had been coupled onto by the* switch engine and moved to another location and had come to rest there. He testified:

"Q. Was the jacking over he was doing, was that done after that move from the 'Wye'? A. Yes, sir, that is the way I recall it.

"Q. After the engine had been moved? A. Yes, sir.

"Q. That is when all the jacking was done? A. Yes, sir."

However, on cross-examination this same witness testified that plaintiff was hurt on the day he claimed while jacking over the generator on the Diesel locomotive; that plaintiff came to him, the witness, and told him he had hurt his back and that witness rubbed his back in an effort to alleviate the pain. And after being confronted with his own prior statement concerning the details of the accident, he admitted that the contents of a statement which he had given plaintiff's attorney was "the truth about what happened out there"—"As far as the witness could understand." This statement contradicted the witness's testimony that the injury to plaintiff did not occur until after the locomotive had been moved and corroborated plaintiff's claim that he, the plaintiff, was hurt when the switch engine coupled onto the Diesel locomotive. In the statement the witness says that while the crew was working on the generator an errand boy from the superintendent's office came on the engine and said they were in a hurry for the Diesel; that a short time later a switch engine hooked onto the Diesel and there was quite a jolt and that shortly after this Quarles came to him and said that he had slipped, causing him to fall and injure his back. Questioned on his independent recollection, the witness stated that he did recall that the crew was told to hurry and that shortly after this there was a bump from the switch engine tying onto the Diesel locomotive, and that it was right after that that the plaintiff said he was hurt.

To our minds, these and additional inconsistencies in defendant's proof and the backing and filling of his own witnesses rob

defendant's case of any real cogency on the particular finding which he attacks. After reading the testimony of certain of defendant's witnesses it is not difficult to understand why the jury may very well have felt that the inconsistencies in defendant's own proof lent considerable conviction and veracity to plaintiff's claim of the details of the occurrence which led up to his injury.

Affirmed.

CODY, J., not sitting.