Tom F. POSER, Appellant,

v.

GENE MOHR CHEVROLET COMPANY
et al., Appellees.

No. 14276.

Court of Civil Appeals of Texas.

Houston.

Feb. 27, 1964.

Rehearing Denied April 2, 1964.

Tynes & Turk, and Raymond L. McDermott, Houston, for appellant.

O. Joseph Damiani, Houston, and Long & Aronson, and Tom Long, Austin, for appellee.

BELL, Chief Justice.

Appellant recovered judgment against Charles N. Hoke for $467.50 as damages for personal injuries sustained by him in an automobile accident which occurred July 6, 1960. The damages consisted of compensation of $374.00 for lost wages, physical pain and mental anguish and $93.50 for doctors and hospital expense.

An intervenor, the owner of the automobile which appellant was driving at the time of the accident, recovered judgment against Hoke for the damages caused its automobile. Recovery by intervenor is not complained of here.

Appellant, as plaintiff, sued Gene Mohr Chevrolet Company and Charles Hoke, who was a salesman working for it seeking to recover damages in the amount of $52,500.-00 for personal injuries received by him when the automobile he was driving was hit by an automobile belonging to the Gene Mohr Chevrolet Company and driven by Hoke in the City of Houston. In his petition he asserted the injuries received by him in the accident consisted of injury to the left elbow, a whiplash injury to his neck, a condition causing headaches and in all probability a protrusion of a lumbar disc. Following such allegations it was

asserted that if it should be shown that he had a pre-existing condition, such condition was neither painful nor disabling but was aggravated and made to flare up by reason of the accident and thus became both painful and disabling and it would continue to cause physical pain and mental anguish for life.

It will thus be seen that appellant's theory was that the accident of July 6, 1960 was the cause of his injuries, or, if he had pre-existing conditions they were not painful or disabling but were activated by the accident, causing pain, disability and the attendant medical and hospital expense and other damages.

The theory of appellees, as shown by their pleading, apart from the denial of any liability on various grounds not necessary to notice, was that any injuries received in the accident, if any were received to the appellant's back, were minor and at most slightly aggravated previously existing conditions such as a congenital anomaly in the lumbar region and disc conditions brought about by previous injuries. Too, its theory was that any disability was brought about, not by the automobile accident, but by an accident of July 14, 1960, which of itself either caused the appellant's trouble or aggravated the conditions antedating the automobile accident of July 6, 1960.

Appellant, apart from asserted procedural errors to be noticed later, complains that the jury's findings that past medical expenses were $93.50; that the main damages were $374.00; and, there would be no future medical expenses, are all contrary to the overwhelming weight and preponderance of the evidence.

On July 21, 1960, appellant went to the doctor and the examination made by the doctor, followed by consultation between doctors, led to the determination that an operation should be performed to correct a protruding lumbar intervertebral disc at the third level (L–3). Due to unavailability of a hospital room the operation was not performed until August 2. It was performed by Dr. Robertson, a very highly regarded neurosurgeon. In this connection quite extensive hospital, medical and doctor's bills were incurred and the evidence will sustain a finding of substantial future medical expense, past mental anguish and physical pain and impairment of earning capacity substantially in excess of that found by the jury. If it can be said that the overwhelming weight and preponderance of the evidence shows that the accident of July 6, 1960 proximately caused the intervertebral disc protrusion or so aggravated the previously existing condition as to require the operation, then the jury's answers above noted are so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong.

■ In determining whether a jury's answer to an issue is against the overwhelming weight and preponderance of the evidence, we must consider all of the evidence, both that which supports the answer and that which militates against it. If after considering all of the evidence we conclude that the answer is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong or manifestly unjust, a reversal for new trial must result. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (S.Ct.); Thompson v. Quarles, 297 S.W.2d 321 (C.C.A.), ref., n. r. e.; Continental Bus System, Inc. v. Biggers, 322 S.W.2d 1 (C.C.A.), ref., n. r. e. We must, therefore, notice the evidence in some detail. The same evidence will be determinative here of the complaint as to each answer.

The operation reflected as congenital condition of the L–5 disc known as spondylolysis, a spina bifida occulta, and a protruding L–3 intervertebral disc which was corrected. The post-operative statement of Dr. Robertson contains the comment that "This patient had been subjected to numerous brutalities by the Russians during World War II where he was a prisoner of war for

four years and endured considerable torture, trauma to his back with rifle bullets (sic), etc., it is believed that it is quite likely that the L-3 disc was injured at this time and has degenerated over this period of years. The other lesion; defects of L-5 is a congenital lesion in all likelihood and has become symptomatic only recently with injury."

Mr. Poser testified he was in the German Navy during World War II. During the war he was wounded in the stomach and in the legs about and below the knee. In 1944 he was captured by the Russians and was held a prisoner for four years. While in prison camp the Russians were guilty of numerous atrocities toward him, but we need only notice that on numerous occasions they beat him in the low part of the back with rifle butts. On occasion it was so severe he had blood in the urine. After the war he worked in the Merchant Marine. He stated these beatings were followed by severe lumbar pain but the episodes were transient. He did his work in the Merchant Marine without incident in connection with his back except for transient episodes of dull aching. The pain did not persist. In 1952 he had a stomach operation in Montreal, Canada. In that connection he was given a spinal anesthesia. Either the next day or six or seven days later he had paralysis from the low back down for several days. X-rays were taken of his back and he was informed there was some kind of fracture of the vertebra. He came to Chicago in 1955. He did heavy work without incident. His dull back aches came and went with changes in the weather. In 1956 he came to Houston and the latter part of the year went to work with Transcontinental Gas Pipe Line Corporation. He worked as an engineer. He was given a physical examination by the employer's physician. His reflexes were checked as were his heart action and blood pressure. He does not remember whether his back was checked or not, but thinks it was. A great deal of his work was in the field and he lifted heavy instruments and had to do climbing.

In 1958 he stooped down to lift a 5-pound instrument and when lifting it he experienced a hard pain in his low back that felt like a knife cutting. The pain radiated through the left leg. He had numb feeling in his legs. He was limping. Mr. Brown, his co-worker, helped him and prevented him from falling. He lay down in the office a good while. He did not go to a doctor and did not lose any time from work. Since that time he says he has had dull aches only with change of weather and these have not interfered with his work. At the time of the automobile accident he had the seat belt fastened. The right front fender of Hoke's automobile hit his left front fender at the light. About $400.00 damage was done to each automobile. His head hit the top of the steering wheel as he went forward, his left elbow hit the window and for a short moment he felt a sharp pain in his back a little lower than the belt line. At the scene of the accident his arm hurt; he had a little headache, and his back hurt a little. He was put in an ambulance and was taken to St. Joseph's Hospital. He lay on the stretcher in the hall until a doctor was called. He had no doctor and Dr. McReynolds, an orthopedics specialist, was called by someone at the hospital to attend him. His arm was x-rayed. His back was not. He complained to Dr. McReynolds that his back hurt a little. The doctor had him bend over and tapped his back with some instrument. The doctor gave him some medicine for pain. He was released from the hospital that day and went home and lay down. He took the medicine and was "droozy." The next morning about 8:30 he went to the office but did not feel like going into the field. He stayed in the office about 45 minutes doing some mathematical work and Mr. Croft made him go home. He still had some pain but the pills he took eased it. He went home and lay down. The next day, which would be Friday, he went to see Dr. McReynolds and then went home. He still had pain and on Monday went to see Dr. McReynolds. He worked part time on Monday in the office. Before July 14, 1960 he did not do any

lifting because he was in pain. He was still taking his pills. On July 14 he went to the field station at Tomball. He helped Mr. Westbrook lift an MIT indicator off a small car and put it near where it was to be set. It weighed about 100 pounds. They lifted it together. After it was set he bent down to put some screws in it. That is when "I really got hurt." The pain really got worse. It felt like sharp cutting and the pain went down his leg and "also inside." Sharp pain about the same as at the time of the automobile accident. He had had pain since the accident but pills relieved it. Since the accident the pain would be worse one day and then get better. It was getting slightly worse before July 14. The pain really got strong after the incident of July 14. He went in to the lab and he was then taken to Dr. Tuttle. Dr. Gordon, Dr. Tuttle's partner, sent him to Methodist Hospital. On July 11, 1960 he gave a statement about the accident. It was given at his office. It was read to him and witnessed by his co-worker and friend, Bill Ameen. The statement contained this with regard to injuries received in the automobile accident: "My left arm was injured. My neck was also hurt for a little while. As far as I know, I wasn't injured in any other way." He explained he didn't mention his back because Dr. McReynolds had said he could go back to work and he had nothing to worry about.

Dr. McReynolds was not called as a witness. The St. Joseph's Hospital record contained this entry under the topic "Treatment": "L. elbow x-ray." Under remarks this entry appears: "left arm hurt, back hurts." Mr. Chebret, one of the investigating officers, went to the hospital to see about the injuries. There he made out an injury card showing only pains in the left elbow. The information, according to Officer Rambie was gotten from the hospital chart, the nurse, and Mr. Poser.

On July 21, 1960, at the Methodist Hospital Mr. Poser gave a history to Dr. Moore. This was the history Dr. Robertson went over with Mr. Poser before the operation.

It shows intermittent back pains of 16 years' duration. It gives information about the beatings from the Russians, the pains that followed which later resolved, the operation in Canada and the 1958 incident. Of the operation in Canada the history shows he was paralyzed from the waist down for about a week and that x-ray was interpreted as showing a fractured vertebra in the lumbar region. It shows that in the 1958 incident appellant had a dull ache and pain radiated down the posteromedial portion of (R) lower extremity to medial aspect of (R) foot. Pain from time to time is precipitated by coughing, vomiting and straining at stool. The history gives this concerning the automobile accident of July 6: "Involved in a car accident resulting in superficial injuries of (L) arm. Hospitalized in St. Joseph Hospital." Then follows description of pain resulting from the July 14 incident, and there is the statement: " * * * the pain has persisted—this is the first time it has been constant for such a long period of time."

The defendant Hoke testified that at the scene of the accident appellant told him he had a broken place on the skin on his elbow and as far as he could tell there was nothing wrong. When Hoke went by St. Joseph's Hospital Mr. Poser was on a stretcher in the hall and told him he didn't think there was anything wrong, that he was feeling fine. This was before examination by the doctor.

Mr. Underwood, a co-worker, testified he had worked with appellant since 1957. He had never noticed any back trouble before the automobile accident. He heard him from time to time, just about like everybody else, complain about his back. He did not know of the 1958 incident. When Mr. Poser came back after the automobile accident he complained of problems with his back. He doesn't remember what part of his back he complained of as Mr. Poser was pretty vague. He didn't send him to drive a tractor. After the accident Mr. Poser seemed to be tender and to proceed carefully. He gives about the same de-

scription as does Mr. Poser of Mr. Poser's action on July 14 following his injury, that is, his complaints and his limping.

Mr. Fryer, a friend, worked very little with appellant. However, they visited each other frequently, particularly before either of them was married. They helped each other move furniture. Mr. Poser did not appear to be having back trouble. On July 6 he went to St. Joseph's Hospital. Appellant was lying on a stretcher in the hall. Mrs. Poser, who was a nurse on duty at St. Joseph's had called him. Appellant complained of his left arm and back. Dr. McReynolds had appellant stand up and make a few turns and bend over, and the doctor tapped him on the back. He took appellant home and appellant was more or less hobbling around. He never looked like that before. For the next few weeks appellant seemed to be getting worse. He never heard Mr. Poser speak of the 1958 incident.

Mr. Storey, who was superintendent of a construction company, was coming to Houston from Lake Jackson and witnessed the collision of July 6. When appellant got out of his automobile he had both hands holding them across the small of his back. He walked bent over and had an expression of pain on his face.

Mr. Westbrook had known appellant 7½ or 8 years at the time of trial. He had worked with him at the Sour Lake Station 7 or 8, and not over 12, times. His contact was casual. Prior to the automobile accident he never saw appellant appear to be having back trouble. He never had trouble lifting things. He saw appellant at Tomball Station 10 days or two weeks after the accident. He and appellant lifted the MIT Indicator and set it on the stand. Appellant straightened up kind of like his back was stiff, like he might have a catch in it or something. Appellant did not say anything. He made no outcry. He did not give the appearance of having received an injury. About 20 or 30 minutes later he saw appellant in the shop and appellant told him his back was hurting. Poser then said he had been in an automobile wreck. He did not say he hurt his back from picking up the indicator. On July 14, before handling the indicator, appellant was making no complaints. He didn't see appellant limping that morning and did not see any grimace of pain on his face.

John O. Brown, Jr. was a fellow worker who was not in close contact with appellant until 1958. Prior to the automobile accident, so far as he knew, nothing was wrong with him. Appellant always did his part. He was with appellant at the time of the 1958 incident. It occurred at a compressor station in Virginia. Appellant reached for a small instrument and then couldn't straighten up. He caught hold of appellant and helped him a little bit. It wasn't serious. Appellant went inside, sat down about an hour and then went back to work and made no complaint. After that he seemed all right. He doesn't remember whether appellant came back to work between the time of the automobile accident and the time he went to the Methodist Hospital.

Dr. Robertson first saw appellant at the Methodist Hospital July 26, 1960. He did not take a history because Dr. Moore had taken it, but he went over the history with appellant. He testified appellant had a spondylolysis of the L–5 level and this could account for his recurring pains. He also found that he had a protruding intervertebral disc at the L–3 level. The disc had degenerated over some period of time. He was certain of the spondylolysis and that this had had a lot to do with the development of symptoms in the lower extremities. He does not doubt that banging with rifle butts set off some of the episodes. He does not know it would be reasonable to conclude when the L–3 difficulty occurred. There is a possibility the degenerative part could have been there a considerable period of time. There is a possibility that the protrusion could have been caused by the accident but the back pain did not become severe until he picked up the MIT Indica-

tor on July 14. Both the spondylolysis and pressure on a nerve at L-3 operated to cause the pain. The doctor, in trying to determine what set off the pain, stated: "I don't know how you settle this thing." He stated probably the shaking in the automobile set off the pain. He thinks the incident of July 14 produced more pain, but it began following the automobile accident. He was then asked this question: "Then it was the accident, in your opinion, doctor, that required ultimately this man to have to submit to surgery?" The answer was this:

"Permit me to say it did precipitate symptoms. This situation is sort of confusing because we don't know and I don't think there is any way of telling which thing was involved— whether the spondylolysis vertebra or the disc caused pain following the accident. I think probably this shaking up that he had as a result of the accident. The 14th incident produced more pain but it began following the accident."

It is reasonable to assume aggravation in the changes already present in the disc. In answer to the question as to what in his opinion happened to the spondylolysis in the accident the witness answered:

"That is why it is so confusing. I couldn't say which one of these was causing his back pain. It is difficult for a patient to say exactly where the level of pain is. It is difficult to localize pain when you have a lot of it in a small area."

Then the question was asked as to whether in reasonable probability the condition of spondylolysis was aggravated by the accident. The witness answered: "I don't know, to be honest. I would guess that it was, because it had been so easily disturbed on previous occasions. I am sure this could very well have accounted for his back pains on previous occasions." The witness then, reluctantly, said he thought in reasonable probability it did aggravate the spondylolysis. He was then asked if

the hospital bills were made necessary by the accident. He answered: "Yes and no. It started a pattern of pain and the pattern of pain caused surgery." He said he would have to relate it to the accident and the incident of July 14. The witness was then asked if the actual disc protrusion in his opinion ante-dated the July 14th incident. He answered: "I think so." He stated you could not put your finger on the initial injury. An injury starts degenerative changes. There may be several days before nerve root pressure sets in. He was then asked: "Is that what happened in this case?" His answer was: "I don't know. There are so many cases where you can't determine or put your finger on what actually produced the injury to the disc." Then he was asked if in his opinion there was traumatic injury to the disc in the automobile accident and the witness answered: "I think that must be assumed."

On cross-examination the witness stated the symptoms are more apt to be intermittent with spondylolysis. With a ruptured disc the symptoms and pain are, more often than not, constant. Appellant had a degenerative disc and often one single event will cause the rupture followed by persistent pain. Appellant's complaint was of intermittent pain covering a 16 year period. The witness just did not know if such a blow as from a rifle butt would commence degeneration. "This is sort of never never land." When a disc becomes degenerated very little trauma can cause aggravation of symptoms. Without further detailing the doctor's testimony, we think it may be characterized by stating that with reluctance he stated the automobile accident in reasonable medical probability was the precipitating cause of the pattern of pain that required surgery.

■ We are unable, after a careful consideration of all of the evidence, the substance of which we have detailed above, to say that the findings of the jury are so contrary to the overwhelming weight and preponderance of the evidence as to be

clearly wrong or manifestly unjust. We particularly note that just a few days after the accident, in the statement appellant gave, he specifically mentioned injuries he received in the accident and did not mention a back injury. Then when he went on station on July 14 to set the MIT Indicator he made no complaint of back pain until after the incident with setting the indicator. Then when he gave the history to Dr. Moore at Methodist Hospital he very carefully detailed his back trouble in the Russian prison camp, the paralysis in Canada following the spinal anesthesia, the fact that an x-ray taken at the time had been interpreted as reflecting a fractured vertebra, the incident of 1958 and the incident of July 14, 1960; but when he mentioned the accident of July 6 he didn't even mention any injury to his back, but stated he received a superficial injury of the left arm. We are not unaware that there is evidence of his complaining of back injury at St. Joseph's Hospital following the accident. This complaint is consistent with the conclusion that the injury was very slight when you consider his subsequent statements minimizing the pains in the back. Too, Dr. Robertson's opinion that the automobile accident probably set off the pattern of pain that made surgery necessary, when viewed in the light of all of his testimony, appears to be a most hesitant conclusion. Too, we gather that the primary basis of such conclusion is the description of the pattern of pain described to him by the appellant which is inconsistent with the statements made by appellant on the other occasions we have mentioned. While a consideration of the evidence might well support a jury's conclusion that there was substantial injury from the accident, we cannot say a contrary conclusion is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong or manifestly unjust.

At the commencement of trial appellant made a motion in limine asking the court to instruct appellees' counsel not to go into the question of whether appellant was a Nazi. It was asserted that in fact he was not but merely served in the German Navy during World War II. The motion was sustained to the extent that appellees' counsel was instructed not to go into the matter without first having approached the bench out of the presence of the jury so the court might determine its relevancy. While appellant was testifying his counsel went into the educational background. On cross-examination appellees' counsel was examining appellant concerning his education. Then this occurrence took place:

"Q  Now, Mr. McDermott asked you about your education. I believe you entered cadet school in Potsdam when you were eleven?

"A  Yes, sir.

"Q  And at that time, were you also in the Scharnhorst?

"A  That was before.

"Q  What is the Scharnhorst?

"A  It is a youth group of the Stahlam.

"Q  Is that the same thing as the Hitler Youth Movement later on?"

At this point appellant's counsel objected "* * * that is too remote." The court then retired the jury. In the absence of the jury the trial court made clear that he interpreted the last question as a violation of his instructions. After some short discussion, the jury was returned to the box. Appellant's counsel then moved the court to instruct the jury to disregard the last question for all purposes, and such instruction was given.

When more than superficial notice is made of the occurrence, no reversible error is shown. Only the most suspicious could read into it the suggestion that appellant was a Nazi. An analysis shows that appellees were going into appellant's educational background, which was relevant. He stated that when he was eleven years

old he entered cadet school at Potsdam and before that he was in the Scharnhorst. The inquiry was made as to whether *later on* the Scharnhorst was the same thing as the Hitler Youth Movement. The only reasonable reading of such shows that before appellant was eleven years old he was a member of an organization known as the Scharnhorst and that later on this organization of which he had at one time been a member became the Hitler Youth Movement. Even if it could be said to be error, we are of the view that in the light of the whole record it was not such as was reasonably calculated to cause and probably did cause the rendition of an improper judgment. Rule 434, Texas Rules of Civil Procedure. The record reflects appellant had become an American Citizen. When the injury occurred he was 35 years old. When he belonged to the Scharnhorst he was just a boy less than eleven years old. The relation of the numerous indignities and atrocities inflicted on him by the Russians, even if he was a Nazi, were such as to but excite sympathy for him or any human being.

Appellant sued not only Hoke, the salesman, but Gene Mohr Chevrolet Company. Judgment was rendered in favor of Gene Mohr Chevrolet Company because the jury found that at the time of the automobile accident Hoke was not acting within the course and scope of his employment. This finding is attacked as being against the overwhelming weight and preponderance of the evidence.

The evidence reflects that on the day in question Hoke had finished his work as a salesman on the floor of his employer. His employer's business was located in the City of Bellaire, which adjoins the City of Houston on the west. A customer who had bought an automobile from Hoke lived on Binz Street, just west of Almeda Road. Her home is a few blocks north of the intersection of Almeda Road and Holcombe Drive where the collision occurred. Hoke drove to the customer's house to deliver her contract and to collect some money owed in connection with her purchase. She gave him a cashier's check for $500.00, which was in excess of what Hoke was to collect. He returned to his employer's office and got change and delivered it to the customer. He then started to his home in the City of Dickinson, which is south of Houston. He was headed toward Dickinson at the time of the collision. There are several routes that may be taken from Houston to Dickinson and the route taken would largely depend on the point of departure from Houston. Usually Hoke went from Bellaire south on Post Oak Road, which is in Bellaire, and on the west part of Houston, and on to Dickinson by way of Pearland and Friendswood. The day of the accident he intended to turn on Holcombe and go to the Gulf Freeway and on it to his home. He had not taken this route before. Considering his point of departure this would be the most direct route. Hoke testified he had finished all work for the day. He had a date that night and was going home to get ready. The automobile he was driving belonged to his employer. He paid for the gasoline used. The employer took care of greasing and oiling it. He used it as a demonstrator. On occasion he had demonstrated it at Dickinson. He had no plans at the time of the collision to demonstrate it to any one. He had no plans to do any business for his employer that day. He was paid on a commission basis.

We are of the view that the Jury's answer is not contrary to the overwhelming weight and preponderance of the evidence.

Appellant objected to the charge of the court insofar as it contained a qualifying instruction relating to damages. The court instructed the jury not to consider as an element of damage nor allow anything for physical pain, mental suffering, etc., because of any condition or disability which existed before July 6, 1960, except insofar as such condition or disability may have been aggravated by the collision in question. This

is, of course, a correct charge and is not objected to. In the paragraph immediately following, the court gave this instruction:

"You are further instructed in connection with such Special Issues you will not consider as an element of damage, nor allow anything for, any physical pain or mental suffering, if any, or loss of earnings or loss of earning capacity, if any, or medical expenses, if any, because of any condition or disability which may have occurred after July 6, 1960, and which was not proximately caused by the collision in question."

The appellant objected to this instruction because it omitted any element of aggravation. His objection makes the point that the charge does not allow the jury to consider that the injuries received in the incident of July 14 may have been aggravated and made worse by reason of the accident of July 6, 1960. At the same time appellant requested the court to add to the instruction this language: "except insofar as such subsequent condition may have been or may in the future in reasonable probability be, aggravated by the collision in question."

▬ The law in our State is that one who receives an injury as a result of the negligence of another can recover all damages proximately traceable to the primary negligence, including subsequent aggravations the probability of which the law regards as a sequence and natural result likely to flow from the original injury. City of Port Arthur v. Wallace, 141 Tex. 201, 171 S.W.2d 480.

As to the charge given, it will be seen that it allows recovery for a subsequently occurring condition or disability if the jury finds it was proximately caused by the collision in question.

▬▬ We are of the view that the instruction was too restrictive and that the objection made was sufficient to point out the error.

It will be noted that in the paragraph immediately preceding, which dealt with the matter of pre-existing injuries or conditions, the court expressly authorized the jury to take into consideration in determining damages any aggravation of them that was caused by the accident of July 6. However, in the paragraph objected to, the court expressly stated the jury could not take into consideration any condition or disability occurring after July 6 which was not proximately caused by the collision in question. The jury might well conclude that in the light of the preceding paragraph the court was telling them they could not consider the fact that the subsequent innocent incident of July 14 may have aggravated the injuries received in the July 6 accident. Under the evidence here, we think a jury might well conclude that the accident of July 6 aggravated the conditions existing at the time and created a worse condition upon which the innocent act of July 14 operated, thereby aggravating the injury of July 6. The effect of the instruction, when we consider it in connection with the preceding paragraph, was to lift out of the term "proximate cause" the matter of aggravation.

▬ Appellant mentions that subsequent aggravation was not pled, but no cases are cited showing such was necessary. While we have found no cases specifically involving subsequent aggravation, and the matter of pleading, we have found Texas cases dealing with aggravation of previously existing conditions. They hold that where the question of aggravation is raised by the evidence, the jury is entitled to consider such in assessing damages and that a charge given which authorized such was not error. Galveston, H. & S. A. R. Co. v. Coker, 135 S.W. 179 (C.C.A.), writ ref.; Gulf, C. & S. F. R. Co. v. Brown, 16 Tex.Civ.App. 93, 40 S.W. 608 (C.C.A.), error dism. We see no reason to apply a different rule as to subsequent aggravations that may be legally material. It is a matter of aggravation being a proximate cause.

We are not to be understood as approving the particular form of instruction as sug-

gested by appellant, but his objection to the instruction given was sufficient to point out the error discussed.

The judgment insofar as it decrees that appellant take nothing against the employer, Gene Mohr Chevrolet Co. or, more accurately its Receiver, H. A. Phillips, who was during trial substituted as a party-defendant, is affirmed because of the jury finding that Hoke was not acting within the course and scope of his employment.

As to the judgment between appellant and Hoke, it is reversed and remanded because of the error in the Court's charge.

### On Motion for Rehearing

Appellee Hoke has filed his motion for rehearing complaining among other things, that this Court failed in its opinion to make any statement with regard to his motion to strike appellant's brief because not filed in this Court within thirty days after the filing of the transcript and statement of facts as contemplated by Rule 414, T.R.C.P. It is the position of the appellee that this Court can only extend the time to file a brief upon motion filed showing good cause and that if there is no such motion the Court must refuse to file an untimely presented brief and strike any brief filed late. It is his further position that under Rule 415, T.R.C.P., and Rule 414, the appeal must then be dismissed.

We do not so construe the rules. The two must be construed together.

Rule 414, after providing that appellant shall file his brief within thirty days after the filing of the transcript in the Court of Civil Appeals and that appellee shall have twenty-five days thereafter in which to file his brief, provides as follows: "Upon good cause shown, the Court of Civil Appeals may grant either or both parties further time for filing their respective briefs, and may extend the time for submission of the case. * * *"

Rule 415 reads as follows:

"When the *appellant* has *failed to file* his brief in the time prescribed, the ap-

pellate court may dismiss the appeal for want of prosecution, *unless good cause is shown for such failure and that appellee has not suffered material injury thereby. The court, may, however, decline to dismiss the appeal, whereupon it shall give such direction to the cause as it may deem proper."* (emphasis here and elsewhere ours)

We are of the view, and hold, that the *power* of the Court of Civil Appeals to allow late filing of a brief is not limited to instances where good cause may be shown *unless* late filing would result in material injury to the opposite party. We hold the Court has *power* to allow late filing of briefs if the opposite party will not be injured even though no good cause is shown and although no formal motion is filed. When construed together these rules mean that Courts of Civil Appeals *may* allow late filings if no injury results to the opposite party and *must* do so if good cause is shown and no harm results to the opposite party. The italicized portion of Rule 415, above quoted, leads inescapably to this conclusion. Even if injury would result to the opposite party, we think the Court has the authority to allow late filing if injury can be removed by a resetting of the case or in some other manner.

Appellee has cited the following cases in support of his motion: Aldridge v. Clinton Park Development Co., 187 S.W.2d 255 (CCA), no writ hist.; Mayrath v. Mayrath, 335 S.W.2d 873 (CCA), no writ hist.; Sneed v. Moore, 330 S.W.2d 472 (CCA); no writ hist.; Black v. Aldrich, 339 S.W.2d 340 (CCA) no writ hist.

We have read all of the cases cited. We will not notice them separately. None of them has held a *want of power* in the Court of Civil Appeals to allow late filing of a brief unless the party has shown good cause for delay. Each of them was an instance in which the Court in the exercise of its judicial discretion refused to allow late filing and dismissed the appeal because the Court was of the view that under the facts

there present no good cause for failure to timely file was shown and presumptively, under the facts there appearing, the opposite party would be harmed.

Now to the facts here involved, insofar as filing of appellant's and appellees' briefs are concerned. Appellant did not file his brief until December 27, 1963. The record was completed in this Court by the filing of the statement of facts on July 12, 1963. The case was, on November 7, 1963, set for submission for February 6, 1964, and the attorneys for appellant and appellees were notified of such setting by letters of that date. After appellant filed his brief on December 27, 1963, appellee, on January 21, 1964, filed his reply brief and his motion to strike appellant's brief and to dismiss the appeal. In the motion appellee recited the facts with regard to the late filing and stated the delay "has resulted in injury to appellees." Nothing but this conclusion concerning injury was stated. He does not complain that he had inadequate time to file a reply brief. He was given the full 25 days following the filing of appellant's brief as provided for in Rule 414 in which to file his brief. He does not complain this was inadequate. He did not ask for any additional time to file his brief.

■ The real purpose of Rule 414, in our view, is to create a situation where when a case in the ordinary course of events is reached for submission it will be ready for submission in its order on the docket and there will be no delay in submission because of failure to file briefs.

■ The tremendous volume of litigation in this Court is such that it is impossible, after a record is filed in this Court, to obtain a setting within a time so as to make compliance with Rule 414 necessary. The result is that this Court has a well known practice of long standing that the appellant may, without motion, file his brief provided it is filed as much as 40 days prior to the date on which the case is to be submitted, and that appellee may without motion file his brief at any time prior to 15 days before submission. If either wishes further delay a motion must be filed. This rule of practice has been known to appellee's counsel since November 11, 1963. Appellee filed a thorough and excellent brief. We find he has been in no way prejudiced by the late filing of appellant's brief.

Appellee's motion to strike appellant's brief and dismiss the appeal is denied.

On the merits of the appeal, appellee complains that we were in error in reversing the case because of the court's charge. He particularly urges that since the innocent accident of July 14 was not pled, appellant was not entitled to an affirmative submission that the jury could consider its having aggravated, if it did, the injuries of July 6. He urges that when the court said the jury could not consider a condition or disability which may have occurred after July 6 which was not proximately caused by the collision in question, this correctly stated the law.

■ As we pointed out in our original opinion, this, as an abstract proposition of law, is correct, but when the paragraph immediately preceding which dealt specifically with *aggravation of previously existing injuries* is considered, we think the jury could and would reasonably conclude that aggravation by the subsequent injury could not be considered. The court, it is true, had previously defined proximate cause using the standard definition which of course says nothing with regard to aggravation. It is also correct, as appellee urges, that where a matter such as aggravation is not specifically pled, a party relying on it is not entitled to an affirmative submission. However, where the court, without any objection from the opposing party (here appellee) assumes to submit it affirmatively, there must be a correct submission, upon objection from the other party sufficiently pointing out in his objection the incorrect manner of submission.

In support of our holding that aggravation caused by subsequent innocent occur-

rence of July 14 could be considered if the jury considered such was an aggravation and was foreseeable, even though not pled, we cited the cases of Galveston, H. & S. A. R. Co. v. Coker, 135 S.W. 179, and Gulf, C. & S. F. R. Co. v. Brown, 40 S.W. 608. We did not mean that in the absence of pleading appellant would be entitled to affirmative submission, but only that he could recover the damages for aggravation as a proximate cause of the collision of July 6 even though aggravation was not specifically pled. Appellee urges that we were incorrect in stating there was in those cases no pleading of the previously existing injuries. We have carefully reread those cases and are of the view our construction was correct. In Galveston, H. & S. A. R. Co. v. Coker, the court had specifically instructed the jury authorizing a recovery for aggravation of previous injuries. The objection was that there was no pleading of aggravation. The court stated: "Plaintiff's contention was that he had not been injured prior to the time of the wreck, and that all injuries from which he was suffering at the time of the trial were caused on account of the wreck." The court then stated that the petition stated: "* * * he received serious, painful, and permanent injuries. Said injuries consisting of the wounding, contusing, and mashing and cutting of his abdomen, and the walls, linings, and partitions thereof, and the tearing and bruising of the entrails and the protrusion thereof."

In spite of plaintiff's contention that all injuries were received in the wreck, the evidence showed he had a hernia which had existed some time before the wreck but it was made larger or aggravated, not caused, by the wreck. In fact he denied he had the hernia before the wreck. Other evidence showed it was previously existing. The court did say, as stated by appellee, that "the charge of the court * * * was clearly authorized by both pleadings and evidence." However, we are of the view that the court meant that though it was not specifically pled, damages for aggrava-

tion were recoverable if the proximate result of the wreck.

In the Gulf, C. & S. F. R. Co. v. Brown case, there was very much the same situation. There the plaintiff was contending prior to his injury he was in good health and that all his troubles were due to injuries received in the wreck. The court said it was proper to charge on aggravation despite plaintiff's claim of previous good health because other evidence raised the issue of previously existing conditions that were aggravated. It is true, as stated by appellee, that at one point in the opinion the court stated it was right to call the attention of the jury to the items "alleged and proved" for which compensation would be allowed. However, the court was clearly referring, in our opinion, to matters other than aggravation.

Appellee's motion for rehearing is overruled.